Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE

**2020 CO 81**

**No. 19SC749 *People v. Lee*—Equal Protection—Second Degree Assault—Deadly Weapon Subsection—Strangulation Subsection.**

This case requires the Supreme Court to determine whether, under prevailing Colorado equal protection principles, a defendant may be charged with second degree assault based on conduct involving strangulation under both the deadly weapon subsection of the second degree assault statute, section 18-3-203(1)(b), C.R.S. (2020), and the strangulation subsection of that same statute, section 18–3–203(1)(i).

The Court now concludes that, with regard to acts of strangulation, the deadly weapon and strangulation subsections of the second degree assault statute proscribe identical conduct, yet the deadly weapon subsection punishes that conduct more harshly than does the strangulation subsection. Accordingly, the Court further concludes that under prevailing Colorado equal protection principles, a defendant may not be charged with second degree assault based on conduct involving strangulation under both the deadly weapon and strangulation

subsections.  Rather, the conduct must be charged under the strangulation subsection.

Accordingly, the court affirms the judgment of the division below.

**2020 CO 81**

**Supreme Court Case No. 19SC749**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 19CA482

**Petitioner:**

The People of the State of Colorado,

v.

**Respondent:**

Dearies Deshonne Austin Lee.

**Judgment Affirmed**
*en banc*
November 23, 2020

**Attorneys for Petitioner:**
George H. Brauchler, District Attorney, Eighteenth Judicial District
Jacob Edson, Chief Deputy District Attorney
        *Centennial, Colorado*

**Attorneys for Respondent:**
Megan A. Ring, Public Defender
Jessica Sommer, Deputy Public Defender
        *Denver, Colorado*

**JUSTICE GABRIEL** delivered the Opinion of the Court.
**JUSTICE SAMOUR** dissents and **CHIEF JUSTICE COATS** and **JUSTICE BOATRIGHT** join in the dissent.

¶1 This case requires us to determine whether, under prevailing Colorado equal protection principles, a defendant may be charged with second degree assault based on conduct involving strangulation under both the deadly weapon subsection of the second degree assault statute, section 18-3-203(1)(b), C.R.S. (2020), and the strangulation subsection of that same statute, section 18-3-203(1)(i).

¶2 The People initially charged Dearies Deshonne Austin Lee with, among other things, two counts of second degree assault-strangulation pursuant to subsection 18-3-203(1)(i), following an incident in which he was alleged to have twice strangled his former girlfriend. Eight months later, the People added two counts of second degree assault-bodily injury with a deadly weapon, namely, hands, pursuant to subsection 18-3-203(1)(b), based on the same conduct. On Lee's motion, the trial court dismissed the two charges of second degree assault-bodily injury with a deadly weapon on equal protection grounds. The People appealed, and in a unanimous, published opinion, a division of the court of appeals affirmed this dismissal order. *People v. Lee*, 2019 COA 130, ¶¶ 20, 28, __ P.3d __. We granted certiorari to consider the equal protection question.[1]

---

[1] Specifically, we granted certiorari to review the following issue:

> Whether the court of appeals erred in concluding a defendant may not be charged for the same conduct under both the deadly weapon subsection of second-degree assault, § 18-3-203(1)(b),

¶3 We now conclude that under prevailing Colorado equal protection principles, a defendant may not be charged with second degree assault based on conduct involving strangulation under both the deadly weapon subsection of the second degree assault statute, section 18-3-203(1)(b), and the strangulation subsection of that statute, section 18-3-203(1)(i). Rather, the defendant must be charged under the strangulation subsection. Accordingly, we affirm the judgment of the division below.

## I. Facts and Procedural History

¶4 Lee had been together with the alleged victim, T.M., for about two years, and the two had a child but were separated at the time of the incident in question. According to T.M., Lee came to her apartment to pick up their child and demanded that T.M. gather the child's belongings. Lee allegedly became frustrated that T.M. was not moving fast enough, and he became violent, ultimately grabbing T.M. by the neck and pushing her onto her bed. According to T.M., Lee continued to apply pressure to her neck until she lost consciousness.

¶5 T.M. subsequently regained consciousness and went into the living room to get her daughter. There, Lee allegedly confronted her again and, according to

C.R.S. (2018), and the strangulation subsection of second-degree assault, § 18-3-203(1)(i), C.R.S. (2018).

T.M., pushed her onto the couch and again began to strangle her, causing her to lose consciousness a second time.

¶6 Based on these allegations, the People charged Lee with, among other things, two counts of second degree assault under the strangulation subsection of the applicable statute, 18-3-203(1)(i). Eight months later, however, the People moved to add two additional counts of second degree assault under the deadly weapon subsection, 18-3-203(1)(b), asserting that Lee had used his hands as a deadly weapon. The trial court granted this motion.

¶7 Thereafter, Lee moved to dismiss the added counts, arguing, among other things, that those counts, as charged, violated his right to equal protection under the Colorado Constitution. The trial court held a hearing on Lee's motion and ultimately granted that motion, dismissing the added counts on equal protection grounds.

¶8 The People immediately appealed the trial court's dismissal order to the court of appeals, arguing that the trial court had erred in its application of prior court of appeals case law. The division, however, unanimously affirmed. *Lee*, ¶¶ 20, 28. As pertinent here, the division reasoned that (1) "charging the same conduct under both subsections would violate a defendant's right to equal protection because the subsections carry different maximum penalties" and (2) the applicable legislative history showed that when the General Assembly amended

4

the second degree assault statute to add the strangulation subsection, it intended that all strangulation conduct would be charged under the strangulation subsection rather than the deadly weapon subsection. *Id.* at ¶ 2.

¶9     The People then petitioned this court for certiorari review, and we granted their petition.

## II. Analysis

¶10     We begin by discussing the applicable standard of review and standards of statutory construction. We then discuss the equal protection principles implicated in this case, and we proceed to apply those principles to the facts before us.

### A. Standard of Review and Principles of Statutory Construction

¶11     We review a trial court's decision to dismiss charges de novo. *People v. Porter*, 2015 CO 34, ¶¶ 6–8, 348 P.3d 922, 923–24. We similarly review questions of law involving statutory construction de novo. *People v. Griego*, 2018 CO 5, ¶ 25, 409 P.3d 338, 342. "In construing a statute, we interpret the plain language of the statute to give full effect to the intent of the General Assembly." *Id.* When the statutory language is unambiguous, we apply the plain and ordinary meaning of the provision. *Id.* "In doing so, we give consistent, harmonious, and sensible effect to each part of the statute, and we interpret every word, rendering no words or phrases superfluous and construing undefined words and phrases according to their common usage." *Id.* In addition, we eschew statutory constructions that lead

to absurd or illogical results. *Frazier v. People*, 90 P.3d 807, 811 (Colo. 2004). And whenever possible, we construe statutes in such a way as to avoid calling their constitutional validity into question. *Adams Cnty. Sch. Dist. No. 50 v. Heimer*, 919 P.2d 786, 790 (Colo. 1996).

## B. Equal Protection

¶12 The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "Although the Colorado Constitution contains no equal protection clause, we have construed the due process clause of the Colorado Constitution[, Colo. Const. art. II, § 25,] to imply a similar guarantee." *Dean v. People*, 2016 CO 14, ¶ 11, 366 P.3d 593, 596. "Equal protection of the laws assures the like treatment of all persons who are similarly situated." *Id.*

¶13 In the criminal law context, the United States Supreme Court has concluded that "where a defendant's conduct violates more than one criminal statute, the government's choice to prosecute under the statute with the harsher penalty does not violate federal equal protection, absent evidence of selective enforcement based on a prohibited standard such as race, religion, or other arbitrary classification." *Id.* at ¶ 14, 366 P.3d at 597; *accord United States v. Batchelder*, 442 U.S. 114, 124–25, n.9 (1979). This court, however, has yet to adopt the federal equal

6

protection standard, the People did not ask us to do so in this case, and thus whether we should adopt the federal standard is not now before us. To the contrary, the parties appear to agree on the applicable principles of Colorado law, and we therefore turn to those principles.

¶14 We have long held, in contrast with the above-noted federal precedent, that "Colorado's guarantee of equal protection is violated where two criminal statutes proscribe identical conduct, yet one punishes that conduct more harshly." *Dean*, ¶ 14, 366 P.3d at 597; *see also People v. Marcy*, 628 P.2d 69, 74–75 (Colo. 1981) (noting that "equal protection of the laws is violated if different statutes proscribe the same criminal conduct with disparate criminal sanctions."). Along the same lines, we have said that "separate statutes proscribing with different penalties what ostensibly might be different acts, but offering no intelligent standard for distinguishing the proscribed conduct, run afoul of equal protection under state constitutional doctrine." *Marcy*, 628 P.2d at 75. Accordingly, we have opined that to overcome an equal protection challenge, "a person of average intelligence" must be able to distinguish the conduct proscribed by one offense from the conduct proscribed by another. *Griego*, ¶ 36, 409 P.3d at 344 (quoting *Marcy*, 628 P.2d at 80–81). Moreover, the distinction between the two offenses must be "sufficiently pragmatic" to "permit an intelligent and uniform application of the law." *Marcy*, 628 P.2d at 78.

7

¶15    Applying these principles in *Marcy*, 628 P.2d at 80, where we addressed a facial challenge to a statute, as opposed to the as-applied challenge now before us, we concluded that the statutory prohibition against extreme indifference murder, as it was then defined, violated a defendant's equal protection rights under the Colorado Constitution because that prohibition could not reasonably be distinguished from the lesser offense of second degree murder. Second degree murder requires proof that the defendant knowingly caused the death of a person. § 18-3-103(1), C.R.S. (2020). Extreme indifference murder, as defined at the time *Marcy* was decided, required proof that "[u]nder circumstances manifesting extreme indifference to the value of human life, [the defendant] knowingly engage[d] in conduct which create[d] a grave risk of death to a person other than himself, and thereby cause[d] the death of another." § 18-3-102(1)(d), C.R.S. (1973) (1978 Repl. Vol. 8). We noted that both provisions mandated "that the death-causing act be done 'knowingly'" and that, although the extreme indifference murder statute contained the additional provision that the act be committed "under circumstances manifesting extreme indifference to the value of human life," we read nothing in that language that rendered the prohibited conduct "reasonably distinguishable from the statutory definition of murder in the second degree." *Marcy*, 628 P.2d at 78.

8

¶16    After the General Assembly amended the extreme indifference murder statute, however, we reached the opposite conclusion. *See People v. Jefferson*, 748 P.2d 1223, 1233 (Colo. 1988). Specifically, after *Marcy* was decided, the General Assembly added language to the extreme indifference murder statute requiring proof that the killing conduct occur "under circumstances evidencing an attitude of universal malice manifesting extreme indifference to the value of human life generally." *Id.* (quoting § 18-3-102(1)(d), C.R.S. (1986)). We noted that this language made clear that extreme indifference murder was committed "only if the killing conduct is of a type which is not directed against a particular person at all." *Id.* In our view, the legislature could rationally decide to punish knowing conduct directed at a particular individual, as required for a conviction of second degree murder, differently from killing conduct that by its very nature evinced a willingness to take human life without regard for the victim. *Id.* We thus concluded that the extreme indifference murder statute, as amended, survived review under Colorado's equal protection principles. *Id.*

## C. Application

¶17    Turning, then, to the facts of this case, we start by examining the statutory language of the two provisions at issue.

¶18    A person commits the crime of second degree assault-strangulation if:

> With the intent to cause bodily injury, he or she applies sufficient pressure to impede or restrict the breathing or circulation of the blood

9

of another person by applying such pressure to the neck or by blocking the nose or mouth of the other person and thereby causes bodily injury.

§ 18-3-203(1)(i). Second degree assault-strangulation is a class four felony and an extraordinary risk crime, subject to a potential prison sentence of two to eight years. §§ 18-1.3-401(1)(a)(V)(A), (10)(a), (10)(b)(XVIII), 18-3-203(1)(i), (2)(b), C.R.S. (2020).

¶19    A person commits the crime of second degree assault-bodily injury with a deadly weapon if, "[w]ith intent to cause bodily injury to another person, he or she causes such injury to any person by means of a deadly weapon." § 18-3-203(1)(b). A deadly weapon, in turn, is defined as "(I) A firearm, whether loaded or unloaded; or (II) A knife, bludgeon, or any other weapon, device, instrument, material, or substance, whether animate or inanimate, that, in the manner it is used or intended to be used, is capable of producing death or serious bodily injury." § 18-1-901(3)(e), C.R.S. (2020). In accordance with this definition, we have opined that hands may be deadly weapons if in the manner they are used, they are capable of producing death or serious bodily injury. *See People v. Saleh*, 45 P.3d 1272, 1276 (Colo. 2002) ("Objects which are not inherently deadly, such as feet and hands, can become deadly weapons when used to start an unbroken, foreseeable chain of events capable of producing serious bodily injury or death."); *People v. Ross*, 831 P.2d 1310, 1313 (Colo. 1992) ("We thus conclude that fists may

10

be deadly weapons if in the manner they are used or intended to be used they are capable of producing death or serious bodily injury."), *abrogated in part on other grounds by Montez v. People*, 2012 CO 6, ¶ 16, 269 P.3d 1228, 1231. Second degree assault-bodily injury with a deadly weapon, like second degree assault-strangulation, is a class four felony, but because it is also a per se crime of violence, it subjects a defendant to a potential prison sentence of five to sixteen years. §§ 18-1.3-401(1)(a)(V)(A), (10)(a), (10)(b)(XII), 18-1.3-406(1)(a), 18-3-203(1)(b), (2)(b), (2)(c)(II), C.R.S. (2020).

¶20 Here, Lee does not contend that subsection 18-3-203(1)(b) is facially unconstitutional. Rather, he contends that applying that provision to an act of strangulation violates prevailing Colorado equal protection principles. To decide this issue, we must determine whether subsections 18-3-203(1)(b) and (1)(i) proscribe identical conduct with one of these subsections punishing that conduct more harshly than the other. *See Dean*, ¶ 14, 366 P.3d at 597. The parties do not appear to dispute that the penalties under these subsections differ. Accordingly, we must decide whether these provisions proscribe identical conduct or, as pertinent here, whether they proscribe what ostensibly might be different acts but offer no intelligent standard for allowing a person of average intelligence to distinguish the conduct proscribed by one provision from that proscribed by the other. *See Griego*, ¶ 36, 409 P.3d at 344; *Marcy*, 628 P.2d at 75.

11

¶21 As noted above, subsection 18-3-203(1)(b) and subsection 18-3-203(1)(i) both require proof that the perpetrator intended to cause bodily injury and, in fact, caused such injury. The distinction between the two lies in the means used to cause that injury. Subsection 18-3-203(1)(b) requires the use of a deadly weapon. Subsection 18-3-203(1)(i), in contrast, requires proof of bodily injury due to strangulation. Accordingly, on their face, these provisions ostensibly proscribe different acts. The question thus becomes whether they offer any intelligent standard for distinguishing between such acts.

¶22 In deciding this question, we find *People v. Stewart*, 55 P.3d 107, 116–18 (Colo. 2002), instructive. There, we considered, among other things, whether the crimes of reckless second degree assault with a deadly weapon and vehicular assault proscribe identical conduct. *Id.* at 116. In that context, we observed that, for the court so to conclude, it would have to determine that a motor vehicle is always a deadly weapon, which we decided it was not. *Id.* at 116–18.

¶23 Consistent with our reasoning in *Stewart*, to decide whether second degree assault-strangulation and second degree assault-bodily injury with a deadly weapon proscribe identical conduct, we must consider whether strangulation, as it is defined in the second degree assault statute, will always involve the use of a deadly weapon. If it does, then under our reasoning in *Stewart*, when applied to

12

an act of strangulation, subsections 18-3-203(1)(b) and (1)(i) would necessarily proscribe identical conduct. *See Stewart*, 55 P.3d at 116.

¶24    Our case law "contemplates a two-step inquiry in determining whether an instrument is a deadly weapon. First, the object must be used or intended to be used as a weapon. Second, the object must be capable of causing serious bodily injury." *Id.* at 117 (citation omitted). A "'weapon' is defined as 'an instrument of offensive or defensive combat: something to fight with: something (as a club, sword, gun, or grenade) used in destroying, defeating, or physically injuring an enemy.'" *People v. Esparza-Treto*, 282 P.3d 471, 476 (Colo. App. 2011) (quoting *Weapon*, Webster's Third New International Dictionary (2002)).

¶25    In the case of strangulation, we have little difficulty concluding that the perpetrator is using an instrument — whether hands or an object of some kind — as a weapon because in such a case, the perpetrator is using the instrument to injure the victim. In addition, when a person is applying sufficient pressure to impede or restrict another's breathing or blood circulation, as required for second degree assault-strangulation, the person is obviously using the instrument of strangulation in a manner capable of causing serious bodily injury, whether or not serious bodily injury actually results: "When a victim is strangled, she is at the edge of a homicide. Unconsciousness may occur within seconds and death within minutes . . . . In 'strangulation,' external compression of the neck can impede

oxygen transport by preventing blood flow to or from the brain or direct airway compression." Gael B. Strack & Casey Gwinn, *On the Edge of Homicide: Strangulation as a Prelude*, 26 Crim. Just. 32, 33 (Fall 2011) (hereinafter "Strack & Gwinn").

¶26 Because, in a strangulation, the instrument being used to strangle the victim (whether hands or otherwise) is always being used as a weapon and will always be at least capable of causing serious bodily injury or death, we conclude that strangulation will always involve the use of a deadly weapon. *See Stewart*, 55 P.3d at 117. As a result, with regard to acts of strangulation, we further conclude that subsections 18-3-203(1)(b) and (1)(i) proscribe identical conduct. *See Griego*, ¶ 36, 409 P.3d at 344; *Stewart*, 55 P.3d at 116; *Marcy*, 628 P.2d at 75. And because these provisions proscribe identical conduct but the deadly weapon subsection punishes that conduct more harshly than the strangulation subsection, we conclude that under prevailing Colorado equal protection principles, a defendant may not be charged with second degree assault based on conduct involving strangulation under both subsections. Rather, the defendant must be charged under the strangulation provision. *See Dean*, ¶ 14, 366 P.3d at 597; *Stewart*, 55 P.3d at 116; §§ 18-1.3-401(1)(a)(V)(A), (10)(a), (10)(b)(XII), (10)(b)(XVIII), 18-1.3-406(1)(a), 18-3-203(1)(b), (1)(i), (2)(b), (2)(c)(II).

14

¶27    In so concluding, we are not persuaded by the People's various hypotheticals purporting to show distinctions between second degree assault-strangulation and second degree assault-bodily injury with a deadly weapon.  In one of the People's hypotheticals, an assailant lightly places his or her hands over the mouth or nose of a victim, "applying sufficient pressure to impede or restrict breathing for a matter of moments."  In the People's view, such a scenario would satisfy the elements of second degree assault-strangulation but not those of second degree assault-bodily injury with a deadly weapon.  For several reasons, we disagree.

¶28    First, as noted above, whenever a person, with the intent to cause bodily injury, causes bodily injury by applying sufficient pressure to the neck or by blocking the nose or mouth of another, thereby impeding or restricting the other person's breathing or blood circulation, the hands or other instrument used to apply such pressure will have been used in a manner capable of producing death or serious bodily injury.  *See* Strack & Gwinn, at 33 (noting that strangulation can result in death within minutes).  Thus, by definition, the perpetrator's hands or other instrumentality of strangulation will have been used as a deadly weapon, even with allegedly "light" pressure.  *See* § 18-1-901(3)(e).

¶29    Second, to the extent that the People's hypotheticals envision scenarios in which the perpetrator is putting a hand over a victim's mouth with allegedly

15

"light" pressure and solely to keep the victim from screaming, it is not clear that this conduct would even constitute second degree assault-strangulation, which, as noted above, requires both an intent to cause bodily injury and resulting bodily injury.

¶30 Third, to the extent that the People's hypotheticals turn on the degree of injury caused to the victim (e.g., bodily injury as opposed to serious bodily injury), such distinctions are not relevant to distinguishing between second degree assault-strangulation and second degree assault-bodily injury with a deadly weapon because the statutory scheme already addresses differences based on the degree of injury: strangulation resulting in bodily injury constitutes second degree assault under subsection 18-3-203(1)(i), and strangulation resulting in serious bodily injury constitutes first degree assault under subsection 18-3-202(1)(g), C.R.S. (2020).

¶31 Finally, in our view, the People's suggestion that the distinction between subsections 18-3-203(1)(b) and (1)(i) should somehow turn on the amount of pressure employed or the length of time a perpetrator applies such pressure does not articulate "a sufficiently pragmatic difference to permit an intelligent and uniform application of the law." *Marcy*, 628 P.2d at 78. In particular, the People do not explain when, in the course of a strangulation, the hands or other instrumentality would cross the line from a non-deadly weapon to a deadly one,

16

and we cannot discern a pragmatic standard that would allow a person of average intelligence to make such a determination.

¶32 For these reasons, we conclude that under prevailing Colorado equal protection principles, a defendant may not be charged with second degree assault based on conduct involving strangulation under both the deadly weapon and strangulation subsections of the second degree assault statute but rather must be charged under the strangulation subsection.

¶33 Although our analysis is based on the plain language of the statutory provisions at issue and we therefore need not resort to other tools of statutory construction, we note that the legislative history of subsection 18-3-203(1)(i) supports our conclusion here.

¶34 The General Assembly added strangulation subsections (and corresponding sentencing provisions) to the assault statutes in 2016. *See* Ch. 327, secs. 1–3, §§ 18-3-202(1)(g), 18-3-203(1)(i), 18-1.3-401(10)(b)(XVIII), 2016 Colo. Sess. Laws 1327, 1327–28. These subsections were intended to institute a change from prosecutors' past practice. *See* Gen. Assemb. Legis. Council, Research Note for H.B. 16-1080, 70th Gen. Assemb., 2d Reg. Sess. (2016). Specifically, prior to these amendments, prosecutors charged strangulation under the deadly weapon subsection of the second degree assault statute. *See* Hearings on H.B. 16-1080 before the H. Judiciary Comm., 70th Gen. Assemb., 2d Sess. (Feb. 9, 2016)

17

(statement of Mark Hurlbert, Assistant Arapahoe County District Attorney). Such a charge, however, frequently required expert testimony, and obtaining such testimony was not always easy, particularly in rural jurisdictions. *Id.* As a result, strangulation often resulted in convictions of the lesser offense of misdemeanor third degree assault. *See id.* (statement of Rep. Mike Foote, sponsor of H.B. 16-1080).

¶35 To address these issues, one goal of the 2016 amendments was to create a specific strangulation statute that dispensed with proof of the deadly weapon element. *Id.* (statement of Rep. Foote) ("The elements [of subsection (1)(i)] don't require the finding of hands as a deadly weapon."). And a second goal was to elevate all forms of strangulation resulting in bodily injury to a felony in order to achieve more consistency in charging decisions and sentencing statewide. *See* Hearings on H.B. 16-1080 before the S. Judiciary Comm., 70th Gen. Assemb., 2d Sess. (Apr. 27, 2016) (statement of Sen. John Cooke); Hearings on H.B. 16-1080 before the H. Judiciary Comm., 70th Gen. Assemb., 2d Sess. (Feb. 9, 2016) (statement of Rep. Mike Foote). Toward that end, the legislation's sponsor stated that he envisioned that all strangulations would be prosecuted under this new provision. Hearings on H.B. 16-1080 before the H. Judiciary Comm., 70th Gen. Assemb., 2d Sess. (Feb. 9, 2016) (statement of Rep. Mike Foote).

¶36 In our view, this legislative history fully supports our conclusion that a defendant in Lee's position must be charged under the strangulation, and not the deadly weapon, subsection of the second degree assault statute. In addition to violating the equal protection principles discussed above, concluding otherwise would undermine the legislature's goal of achieving more consistency in charging decisions and sentencing statewide. *See* Hearings on H.B. 16-1080 before the S. Judiciary Comm., 70th Gen. Assemb., 2d Sess. (Apr. 27, 2016) (statement of Sen. John Cooke); Hearings on H.B. 16-1080 before the H. Judiciary Comm., 70th Gen. Assemb., 2d Sess. (Feb. 9, 2016) (statement of Rep. Mike Foote).

### III. Conclusion

¶37 For the reasons set forth above, the deadly weapon subsection of the second degree assault statute, subsection 18-3-203(1)(b), and the strangulation subsection of that statute, subsection 18-3-203(1)(i), proscribe identical conduct, yet the deadly weapon subsection punishes that conduct more harshly than does the strangulation subsection. Accordingly, we conclude that under prevailing Colorado equal protection principles, a defendant may not be charged with second degree assault based on conduct involving strangulation under both the deadly weapon and strangulation subsections. Rather, the conduct must be charged under the strangulation subsection.

¶38 We therefore affirm the judgment of the division below.

19

**JUSTICE SAMOUR** dissents and **CHIEF JUSTICE COATS** and **JUSTICE BOATRIGHT** join in the dissent.

JUSTICE SAMOUR, dissenting.

¶39 "Two roads diverged in a wood, and [this court] took the one less traveled by." As in Robert Frost's seminal poem, "The Road Not Taken," that decision "has made all the difference." But here, the path less trod is not a desirable one: This court's stubborn loyalty to Colorado's unique equal protection doctrine—one that has been soundly rejected by the U.S. Supreme Court and the overwhelming majority of jurisdictions—infringes on the charging discretion of the executive branch of government with no discernible justification beyond "my house, my rules." Or perhaps this is yet another area in which "we think we know better." *Maestas v. People*, 2019 CO 45, ¶ 35, 442 P.3d 394, 401 (Samour, J., concurring in the judgment only) (discussing Colorado's plain error framework, which differs from the U.S. Supreme Court's). And while our court's inexplicable resistance to the logical force of the U.S. Supreme Court's unanimous decision in *United States v. Batchelder*, 442 U.S. 114 (1979), is reason enough for me to dissent, I further believe that, even under Colorado's peculiar equal protection doctrine, there is no due process violation here. Accordingly, I respectfully dissent on both grounds.

## I. Analysis

### A. Equal Protection Is Not Threatened by Prosecutorial Discretion

¶40 The majority's decision is premised on the view that prevailing Colorado equal protection principles are sound. Maj. op. ¶ 3. But there is good reason to

1

think they are not.[1]  Both the U.S. Supreme Court and the vast majority of our sister jurisdictions agree that the government's choice to prosecute a defendant under the harsher of two available criminal statutes does *not* violate equal protection, absent evidence of selective enforcement.  *See, e.g.*, *Batchelder*, 442 U.S. at 123–25, 125 n.9 (explaining that "when an act violates more than one criminal statute, the Government may prosecute[] under either," regardless of differences in severity, so long as the Government doesn't discriminate "based upon an unjustifiable standard such as race, religion, or other arbitrary classification").  In finding to the contrary, our court is in a legal no man's land.  In my view, it would behoove us to, at long last, move infield and join the predominant view.

¶41     *Batchelder* presents persuasive reasons for doing so.  There, the U.S. Supreme Court reasoned that, "[s]o long as overlapping criminal provisions clearly define the conduct prohibited and the punishment authorized, the notice requirements

---

[1] In fairness to my brothers and sisters in the majority, we did not grant certiorari on whether the time has come to formally put out of its misery our idiosyncratic equal protection methodology.  By the same token, I accord no weight to the fact that "the People did not ask us" to adopt the federal equal protection standard or to the parties' apparent agreement "on the applicable principles of Colorado law."  Maj. op. ¶ 13.  Based on the limited issues we agreed to review, the parties understandably assumed that we would continue wedded to our antiquated ways.  Nevertheless, because the outmoded equal protection doctrine that controls in our state serves as the linchpin for the majority opinion, I am compelled to address it.

of the Due Process Clause are satisfied" regardless of whether the overlapping provisions "create uncertainty as to which crime may be charged and therefore what penalties may be imposed." *Id.* at 123. Overlapping criminal statutes create no more uncertainty than "a single statute authorizing various alternative punishments." *Id.* To find otherwise, the Court concluded, would be to infringe upon decisions that "generally rest in the prosecutor's discretion." *Id.* at 124. The *Batchelder* Court rejected the contention that equal protection is violated where two criminal statutes proscribe identical conduct, yet one prescribes harsher penalties than the other. *Id.* It thus dismissed concerns that prosecutorial discretion could produce "unequal justice" as "factually and legally unsound." *Id.*

¶42 That is no easily dismissed, peripheral inconsistency with our equal protection jurisprudence. Rather, it is a jugular strike to the dated principles we adopted eons ago but to which our court now clings with fierce determination.

¶43 I recognize that the equal protection tenets underpinning today's decision are entrenched in the Colorado Constitution, and this court is, of course, "the final arbiter of the meaning" of the state constitution. *Curious Theatre Co. v. Colo. Dep't of Pub. Health & Env't*, 220 P.3d 544, 551 (Colo. 2009). But we have "generally declined to construe the state constitution as imposing . . . greater restrictions [than the federal constitution] in the absence of textual differences or some local circumstance or historical justification for doing so." *Id.* This tendency is rooted,

3

not in any reluctance to engage in independent thought, but in a desire to preserve faith in judicial institutions: "Simply disagreeing with the United States Supreme Court about the meaning of the same or similar constitutional provisions, even though we may have the power to do so, risks undermining confidence in the judicial process and the objective interpretation of constitutional and legislative enactments." *Id.*

¶44 Significantly, we have never offered a meaningful reason, i.e., a "textual difference[]," "local circumstance," or "historical justification," *id.*, for our aberrancy in the equal protection arena. None exists. There is no substantive difference between the language of our relevant constitutional provision and its federal counterpart. Nor have we ever identified a local circumstance or other justification (historical or otherwise) for our insistence on being a dissident court.

¶45 Not surprisingly, almost every jurisdiction that had held that a defendant's prosecution under the harsher of two statutes proscribing identical conduct violated principles of equal protection changed tack following the pronouncement in *Batchelder*. *People v. Griego*, 2018 CO 5, ¶ 58, 409 P.3d 338, 348 (Coats, J., dissenting) (citing *Hart v. State*, 702 P.2d 651, 659–63 (Alaska Ct. App. 1985); *Sheriff, Clark Cty. v. Killman*, 691 P.2d 434, 436 (Nev. 1984); *City of Klamath Falls v. Winters*, 619 P.2d 217, 228–31 (Or. 1980); *State v. Cissell*, 378 N.W.2d 691, 695–700 (Wis.

4

1985)).  Indeed, *ninety percent* of the country has deferentially followed in the footsteps of *Batchelder*.[2]

¶46     I am particularly concerned that our court has recently started breathing new life into Colorado's "discredited and largely moribund equal protection theory."  *Griego*, ¶ 51, 409 P.3d at 346 (Coats, J. dissenting).  In his dissent in *Griego*, Chief Justice Coats explained that in the decades leading up to that decision, we had limited this state constitutional doctrine "practically out of existence."  *Id.* at ¶ 58, 409 P.3d at 348 (citing *Dean v. People*, 2016 CO 14, ¶¶ 14–15, 366 P.3d 593, 597–98).  The Chief Justice was dead-on.  Before *Griego*, no equal protection challenge had succeeded in this court for more than a quarter century.  *Id.*  This court's steadfast refusal to find identical proscriptions among different statutes had kept the flimsy dogma six feet under.  *Id.*  But *Griego* imprudently exhumed and reanimated it.  *Id.*  As a result, Colorado's idea of equal protection has gone

---

[2] In addition to Colorado, the holdout states are: Hawaii, Utah, Kansas, and Maryland.  *See, e.g.*, *State v. Modica*, 567 P.2d 420, 421–22 (Haw. 1977); *State v. Shondel*, 453 P.2d 146, 147 (Utah 1969); *State v. Thompson*, 200 P.3d 22, 34 (Kan. 2009); *Alston v. State*, 71 A.3d 13, 23 (Md. 2013).

5

from being nothing more than "a burden for the lower courts . . . to entertain and reject when raised," *id.* at ¶ 58, 409 P.3d at 349, to a haven where meritless equal protection claims find refuge.

¶47 In the wake of *Griego*, our court appears to be permitting its atypical equal protection doctrine to have a more sweeping reach. It is disconcerting that instead of looking for a way to depart from the equal protection island on which this court is currently marooned, we seem to be drifting even further from the U.S. Supreme Court and other courts. Indeed, of the five states that continue to snub their noses at *Batchelder*, Colorado now falls on the more extreme end of the doctrinal spectrum. Utah, for example, limits its equal protection jurisprudence to the "unusual and rare phenomenon" in which two statutes are "wholly duplicative" and has committed to following *Batchelder* in all other respects. *State v. Williams*, 175 P.3d 1029, 1033–35 (Utah 2007) (declining to find an equal protection violation because the elements of felony drug possession and the elements of misdemeanor possession of drug paraphernalia did not fully overlap).

¶48 Because I don't understand why we obstinately continue to defy *Batchelder*, and because there is zero justification for doing so, today I gladly take up the proverbial baton from our Chief Justice. As he suggested in *Griego*, we would do well to embrace *Batchelder* and its plentiful progeny. Forty-one years after *Batchelder* was handed down, isn't it time for us to finally get in line?

6

## B. The At-Issue Criminal Provisions Proscribe Different Conduct

¶49    It is undisputed that, under the *Batchelder* standard, there is no equal protection violation here.  However, even applying Colorado's nonconformist, behind-the-times standard, Lee's equal protection claim falls woefully short.

¶50    The equal protection question presented in this case ultimately turns on whether subsections 18-3-203(1)(b) and (1)(i), C.R.S. (2020) proscribe identical conduct, with one of them providing harsher punishment than the other.  *Dean*, ¶ 14, 366 P.3d at 597.  They do not.

¶51    A person commits the crime of second degree assault (strangulation) if:

> With the intent to cause bodily injury, he or she applies sufficient pressure to impede or restrict the breathing or circulation of the blood of another person by applying such pressure to the neck or by blocking the nose or mouth of the other person and thereby causes bodily injury.

§ 18-3-203(1)(i).[3]

¶52    A person commits the crime of second degree assault (bodily injury with a deadly weapon) if:

> With intent to cause bodily injury to another person, he or she causes such injury to any person by means of a deadly weapon.

---

[3] Second degree assault (strangulation) is a class four felony and an extraordinary risk crime, subject to a potential prison sentence of two to eight years. §§ 18-1.3-401(1)(a)(V)(A), (10)(a), (10)(b)(XVIII), 18-3-203(1)(i), (2)(b), C.R.S. (2020).

§ 18-3-203(1)(b).[4]  We have held that deadly weapons can include hands if hands are used in a manner capable of producing death or serious bodily injury.  *See People v. Saleh*, 45 P.3d 1272, 1276 (Colo. 2002) ("Objects which are not inherently deadly, such as feet and hands, can become deadly weapons when used to start an unbroken, foreseeable chain of events capable of producing serious bodily injury or death.").

¶53    The majority concedes that, "on their face, these provisions ostensibly proscribe different acts," maj. op. ¶ 21, with the former requiring bodily injury stemming from strangulation, and the latter, by contrast, requiring bodily injury caused by means of a deadly weapon.  Further, the majority acknowledges that the operative question under *People v. Stewart*, 55 P.3d 107, 116–18 (Colo. 2002), is whether strangulation, as used in the second degree assault statute, "will always involve the use of a deadly weapon."  Maj. op. ¶ 23.  Where the majority veers off track is in answering the question.  It concludes that "[b]ecause, in a strangulation,

---

[4] Second degree assault (bodily injury with a deadly weapon), like second degree assault (strangulation), is a class four felony, but because it is also a per se crime of violence, it subjects a defendant to a potential prison sentence of five to sixteen years, which is a harsher penalty than that prescribed for second degree assault (strangulation).    §§ 18-1.3-401(1)(a)(V)(A),  (10)(a),  (10)(b)(XII), 18-1.3-406(1)(a), 18-3-203(1)(b), (2)(b), (2)(c)(II), C.R.S. (2020).

8

the instrument being used to strangle the victim (whether hands or otherwise) is always being used as a weapon and will always be at least capable of causing serious bodily injury or death . . . strangulation will always involve the use of a deadly weapon." *Id.* at ¶ 26. This analytical misstep steers the majority down an errant path and results in the conflation of the two distinct crimes.

¶54 To illustrate the point, I borrow from a hypothetical example presented by the People, with some minor modifications of my own. Assume that an assailant pinched the mouth and nose of a victim, puncturing the skin of the victim's nose and mouth and applying sufficient pressure in the process to impede or restrict breathing for a matter of moments. Assume further that the assailant also intended to puncture the victim's skin and briefly restrict the victim's breathing—but no more.[5]

¶55 Such a scenario would satisfy the elements of second degree assault (strangulation) but *not* those of second degree assault (bodily injury with a deadly weapon). First, there was intent to cause bodily injury. Second, there was in fact bodily injury by virtue of pressure applied to the victim's nose and mouth, which

---

[5] Unlike my hypothetical, the People's hypothetical involves an assailant who lightly placed his hand on the mouth and nose of a victim without puncturing the skin.

9

punctured the skin and briefly impeded breathing. But the hands were themselves not a deadly weapon. In fact, they were no more deadly than the claws of an irritable cat: They may have left marks and punctured the skin, but they were not *used in a manner* capable of causing death or serious bodily injury. Hence, the defendant in my hypothetical could be guilty of second degree assault (strangulation) without simultaneously being guilty of second degree assault (bodily injury with a deadly weapon). Where's the equal protection issue?

¶56 The majority finds the People's fundamentally similar hypothetical unpersuasive. But the majority's criticisms of that hypothetical are unwarranted.

¶57 First, the majority claims that "whenever a person, with the intent to cause bodily injury, causes bodily injury by applying sufficient pressure to the neck or by blocking the nose or mouth of another, thereby impeding or restricting the other person's breathing or blood circulation, the hands . . . used to apply such pressure will have been *used in a manner* capable of producing death or serious bodily injury." *Id.* at ¶ 28 (emphasis added). But that's not true. My example spotlights the majority's mistake—in a scenario that otherwise satisfies the elements of second degree assault (strangulation), the hands need not always be *used in a manner* capable of producing death or serious bodily injury. The flaw in the majority's analysis is that it assumes, incorrectly, that in the type of

10

hypothetical discussed, the hands will *always* be used in a manner capable of producing death or serious bodily injury.

¶58    Second, the majority criticizes the People's hypothetical on the ground that it is not clear whether the assailant's conduct "would even constitute second degree assault-strangulation, which . . . requires both an intent to cause bodily injury and resulting bodily injury." *Id.* at ¶ 29.  But this objection is easily overcome with a minor tweak to the People's hypothetical, as I have demonstrated.  In my hypothetical, the assailant intended to cause bodily injury, by placing pressure on the victim's nose and mouth, and caused bodily injury, by puncturing the victim's skin and temporarily impeding the victim's ability to breathe.

¶59    The majority next picks a bone with the implication in the People's hypothetical that the distinction between the two crimes under scrutiny may be based on the *amount* of pressure employed or the *length* of time a perpetrator applies such pressure.  In the majority's view, that distinction does not articulate "a sufficiently pragmatic difference to permit an intelligent and uniform application of the law," *id.* at ¶ 31 (quoting *People v. Marcy*, 628 P.2d 69, 78 (Colo. 1981)), and does not set a bright line with which to differentiate non-deadly hands from deadly ones.  I beg to differ.

¶60 As the majority recognizes, our case law subscribes to a two-step inquiry for determining whether an instrument is a deadly weapon. First, the object must be used or intended to be used as a weapon. *Stewart*, 55 P.3d at 117. Second, the object, in the manner in which it is used, must be capable of causing death or *serious* bodily injury. *Id.* On the first question, the majority and I are of one mind —there is no doubt that when hands are used in second degree assault (strangulation), they are used as a weapon. But in answering the second question, the People's reliance on the amount of pressure, or the length of time that pressure is applied, is actually instructive. Both circumstances are directly relevant to the manner in which the hands are used. Hands, which are not inherently deadly, *become* deadly when the amount of pressure or the length of time that pressure is applied makes them "capable of producing death or *serious* bodily injury," *People v. Ross*, 831 P.2d 1310, 1313 (Colo. 1992) (emphasis added), *abrogated in part on other grounds by Montez v. People*, 2012 CO 6, ¶ 16, 269 P.3d 1228, 1231, as opposed to merely *bodily* injury. The majority's analysis renders irrelevant the manner in which a weapon is used in a strangulation case.

¶61 This response dovetails nicely with my retort to the majority's remaining criticism. The majority finds fault with the People's hypothetical "to the extent" it "turn[s] on the degree of injury caused to the victim (e.g., bodily injury as opposed to serious bodily injury) . . . because the statutory scheme" already distinguishes

12

based on the degree of injury. Maj. op. ¶ 30. It is true that strangulation resulting in *bodily injury* constitutes second degree assault under subsection 18-3-203(1)(i), while strangulation resulting in *serious bodily injury* constitutes first degree assault under subsections 18-3-202(1)(a) and (g), C.R.S. (2020). However, contrary to the majority's contention, the People's hypothetical doesn't turn on the injury-based statutory difference between second degree assault (strangulation) and first degree assault (strangulation). It turns on whether, in a manual strangulation case, the hands are used in a manner capable of causing death or serious bodily injury. Granted, the resultant injury (including possibly death) will be strong evidence of the capability of the hands based on the manner in which they were used.

¶62    I circle back to the critical question on which the majority and I see eye-to-eye: Whether "strangulation . . . will always involve the use of a deadly weapon." Maj. op. ¶ 23. But, while the majority asks the right question, it fails to give the right answer, and, unlike in *Jeopardy!*, both are required here.

¶63    Recall that, while hands can become deadly when used in a manner capable of producing serious bodily injury or death, they are not inherently deadly. *Saleh*, 45 P.3d at 1276. My hypothetical proves as much. Because the hands there were not used in a manner capable of producing serious bodily injury or death, they were not a deadly weapon. The fact that a different strangulation case may involve the use of hands in a manner capable of causing serious bodily injury or death

13

doesn't alter this conclusion. The point is that, unlike the majority, I'm not willing to assume that all manual strangulations—never mind all strangulations—are equal. They're not. It follows that the correct answer to the critical question is inevitably "no"; strangulation will *not* always involve the use of a deadly weapon.

¶64 I see no problem with discriminating between proscribed conduct based on whether hands or other strangulation instruments are deadly weapons. What is the argument for finding an equal protection violation on the basis of such a distinction? Even under Colorado's eccentric standard, this type of difference surely passes muster. That the legislature distinguished between first degree assault (strangulation) and second degree assault (strangulation) based in part on the resultant injury is of no moment to the validity of the deadly-weapon based distinction it drew between second degree assault (strangulation) and second degree assault (bodily injury with a deadly weapon).

¶65 Applying our equal protection doctrine, we have differentiated criminal conduct covered by two statutory provisions on much thinner grounds. For example, in *Campbell v. People*, 73 P.3d 11, 13 (Colo. 2003), we held that penalizing possession of a controlled substance more harshly than use of a controlled substance did not violate our equal protection doctrine. We found that the elements of the statutes proscribing possession and use were distinct, even though possession is an implicit prerequisite for use. *Id.*

14

¶66 Given this precedential trajectory, I see no basis for declining to distinguish between the two statutory provisions before us today on what are far more substantial grounds. If there was no equal protection violation in *Campbell*, how can there be one in this case? "[A] person of average intelligence" would be able to differentiate between the two types of conduct presented here, *People v. Griego*, 2018 CO 5, ¶ 36, 409 P.3d 338, 344 (quoting *Marcy*, 628 P.2d at 80–81), and so too should we.

## II. Conclusion

¶67 In sum, I respectfully disagree with the majority's decision to find an equal protection violation in this case. I also take issue with the majority's continued efforts to resuscitate our unorthodox equal protection doctrine, which has been roundly rejected and widely criticized by the U.S. Supreme Court and the majority of our sister jurisdictions. Like Chief Justice Coats, I believe that our failure to adopt the prevailing view infringes upon the charging prerogatives entrusted to the executive branch. Accordingly, I respectfully dissent.

I am authorized to state that CHIEF JUSTICE COATS and JUSTICE BOATRIGHT join in this dissent.