**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 21, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

REID POLLACK,

     Plaintiff - Appellant,

v.

POLLY MILLER,

     Defendant - Appellee.

No. 20-1255
(D.C. No. 1:17-CV-02444-DDD-NRN)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **BRISCOE**, and **BACHARACH**, Circuit Judges.
_____

Reid Pollack, proceeding pro se,[1] appeals from the district court's order

granting summary judgment in favor of Detective Polly Miller on Pollack's

42 U.S.C. § 1983 action raising claims of malicious prosecution and judicial

deception.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal.  *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is therefore ordered submitted without oral argument.  This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] "Because [Pollack] is pro se, we liberally construe his filings, but we will not act as his advocate."  *James v. Wadas*, 724 F.3d 1312, 1315 (10th Cir. 2013).

# BACKGROUND

The events underlying this case began with a 911 call on July 5, 2014, by Pollack's girlfriend, Karen Rusnik. After asking the dispatcher to "bear with [her]" because she had previously suffered a stroke, Rusnik gave her address in Niwot, said that Pollack was there, and asked for help getting her "stuff out." R. vol. 1 at 710-11. Boulder County Sheriff's Deputy Keith Powell called Rusnik later that day. She told him she had moved out but was afraid to retrieve her belongings because she did not want to get into a conflict with Pollack, who she said was "very mean and abusive." R. vol. 2 at 40. Deputy Powell asked when he last abused her, and she said on June 30, 2014, between 12:00 p.m. and 1:00 p.m. She stated that Pollack became angry while looking for car keys and that he put his hands around her neck and pushed down for two to three seconds, making it hard to breathe. She noted there were no witnesses but said a former roommate took photos of bruising to her neck. Deputy Powell reported that Rusnik was difficult to understand and that she said she suffered a stroke about four years earlier when he asked if she had any mental difficulties.

Deputy Powell then contacted Pollack, who denied any altercation. He stated that on June 30, Rusnik entered the house around 11:00 a.m. and said her car was in the middle of the road. Pollack told her "to jiggle the wires to get the car running again." *Id.* Later that day, two officers came to the house and said his vehicle was abandoned in a nearby intersection. Pollack ran to the vehicle and moved it out of

2

the intersection. Pollack added that he had not seen Rusnik since that day and that he had "pack[ed] some of [her] items because he figured she had moved out." *Id.*

Deputy Powell next met with Rusnik in person. He noted no injuries to her neck or hoarseness in her voice. Because the parties provided conflicting accounts, Deputy Powell asked Rusnik for a phone number for her former roommate. But when Deputy Powell called him, the roommate refused to say whether he had taken any photos and ultimately hung up the phone. Rusnik then identified a small bruise on her chin, which she noticed several days earlier but was not certain had resulted from the altercation. She also demonstrated how Pollack had grabbed her neck, and she characterized the pressure he applied as a 7 on a scale from 1 to 10.

Deputy Powell did not believe there was enough evidence to arrest Pollack, so Detective Miller was assigned to investigate further. She initially called Rusnik, Pollack, and Rusnik's former roommate but was unable to reach any of them. On July 25, she drove to an address listed for Rusnik. Billie Riley lived there, and neither she nor Rusnik were present. Detective Miller spoke with Riley's daughter, who said Rusnik was friends with Riley and "was staying there for a while earlier this month." *Id.* at 43. Detective Miller then spoke with Riley on the phone, who stated she did not know Rusnik's location but suspected she had returned to Pollack's house. Riley added that Pollack and Rusnik had "been dating off and on for over 14 years," that she had known Rusnik "for about 8 or 9 years," and that he had treated Rusnik "poorly" since she suffered her first stroke "about 6 years ago." *Id.* at 44.

3

Riley explained that Rusnik called her in the early evening on June 30 and asked for a ride. Riley was at work and said she could come later, at which point "she heard [Rusnik] start crying and sounding very scared." *Id.* Rusnik said that she had gotten in a fight with Pollack and that he "tried to choke her." *Id.* Riley later drove to Pollack's house and found Rusnik waiting outside. She looked tired and said, "she just needed to get away from there and wanted to go [Riley's] house." *Id.* Rusnik said that Pollack "was extremely angry" about his car breaking down and that "[h]e put his hands around her neck and squeezed her really hard." *Id.* Riley said she saw "red finger shaped marks on her neck." *Id.* Riley also described two incidents when Pollack purposely delayed obtaining medical care for Rusnik.

Based on Riley's statement and Deputy Powell's report, Detective Miller believed she had probable cause to arrest Pollack for second-degree assault. She obtained approval from her supervisor to conduct a warrantless arrest, citing the "urgency factor" that Rusnik had returned to Pollack's home. *Id.* at 45. Detective Miller, along with Deputy Steve Kellison, drove to Pollack's house, where they encountered Rusnik in the front yard. Detective Miller told her that they were there to arrest Pollack, but Rusnik "was not happy" and said, "she wished [Detective Miller] would just go and forget all about it." *Id.* Rusnik also allegedly stated that Pollack had "not done anything to her since she came back," had "promised to stay away from heroin," and had not done "any drugs" in two weeks. *Id.* at 45.

According to Miller, Rusnik became less nervous after Pollack was arrested. Rusnik told her: (1) she had been driving one of Pollack's cars when it broke down;

4

(2) she returned to the house to tell him; (3) "he got angry right away and started cussing [at] and blaming her"; (4) he grabbed her neck with both hands and squeezed "until she started having difficulty breathing"; (5) he released her after a few seconds and walked away; and (6) she stayed with Riley until she called the police days later. *Id.* Rusnik also described two prior incidents when Pollack delayed obtaining medical care for her. Detective Miller then went to the jail to interview Pollack, who said that he had been sober for years, that he and Rusnik did not argue about the car, and that he did not choke her. He also suggested that Rusnik, whose ex-husband had been abusive, was conflating "old and new memories." *Id.* at 46.

Two days after the arrest, Detective Miller completed a probable cause affidavit, recounting the arrest, her conversation with Riley, her interview with Rusnik after the arrest, and Rusnik's communication difficulties. A state magistrate reviewed the affidavit and found it contained probable cause. On July 30, the District Attorney's Office filed a criminal complaint charging Pollack with second-degree assault under Colo. Rev. Stat. § 18-3-203(1)(b). He was released the following day on a bond that included a no-contact order. On August 2, he was arrested for violating the no-contact order after returning to his house, where Rusnik was living, to check on a business he operated from his home. Over a year later, the District Attorney's Office dismissed the assault charge because it could not locate Rusnik to testify. Nevertheless, in April 2016, a jury found Pollack guilty of violating the no-contact order, and he was sentenced to one year in Community Corrections. In May 2017, after the no-contact order expired, Pollack allegedly spoke with Rusnik, and

5

she denied speaking with Detective Miller after his arrest, contrary to the representations in the probable cause affidavit.

In October 2017, Pollack filed a § 1983 action against Detective Miller, Deputy Kellison, and Boulder County, claiming, inter alia, false arrest, malicious prosecution, and a violation of his speedy trial and double jeopardy rights. Defendants moved to dismiss, and Pollack moved for leave to amend his complaint. A magistrate judge recommended dismissing all of Pollack's claims but also granting in part his motion for leave to amend, which allowed Pollack to add a claim for judicial deception and to clarify that his malicious prosecution claim only concerned the assault charge and not the violation of the no-contact order. Pollack did not object, and the district court adopted the recommendations. Pollack then filed his amended complaint solely against Detective Miller and raising claims of malicious prosecution and judicial deception. Detective Miller moved for summary judgment, and the district court granted her motion. Pollack timely appealed.

## DISCUSSION

Pollack contends the district court erred in granting summary judgment for Detective Miller. Our review is "de novo, drawing all reasonable inferences and resolving all factual disputes in favor of the non-moving party." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 968 (10th Cir. 2017) (internal quotation marks omitted). Summary judgment is required when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine when the evidence is

6

such that a reasonable jury could return a verdict for the nonmoving party, and a fact is material when it might affect the outcome . . . ." *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016) (internal quotation marks omitted). "To defeat a motion for summary judgment," the non-movant must present "more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). Additionally, "[t]o overcome a qualified-immunity defense at summary judgment, a plaintiff must demonstrate (1) that on the facts alleged the defendant violated his or her constitutional rights, and (2) that the right was clearly established at the time of the alleged unlawful activity." *Huff v. Reeves*, 996 F.3d 1082, 1087-88 (10th Cir. 2021) (ellipsis and internal quotation marks omitted).

As an initial matter, although Pollack contends his arrest was unconstitutional, he failed to object to the magistrate judge's recommendation, which the district court adopted, that his false arrest claim be dismissed. The false arrest claim therefore is subject to this court's firm waiver rule, and Pollack has not argued that he "is entitled to relief from the rule in the interests of justice." *Davis v. Clifford*, 825 F.3d 1131, 1137 n.3 (10th Cir. 2016) (internal quotation marks omitted).[2] In addition, Pollack offers no argument in his opening brief regarding his judicial deception claim. We decline to consider this claim because (1) we "do[] not ordinarily review issues raised

---

[2] In his initial reply brief, Pollack stated that he is no longer pursuing his false arrest claim and that his failure to object to the magistrate judge's recommendation "is not relevant," Aplt. Reply Br. at 5. Although his amended reply brief, which he filed with leave of court, includes no such concession, neither does it contest Defendants' argument that his false arrest claim is barred by the firm waiver rule.

for the first time in a reply brief"; and (2) his reply brief offers only a "perfunctory and conclusory" argument for this claim. *SEC v. DeYoung*, 850 F.3d 1172, 1180 n.3 (10th Cir. 2017) (internal quotation marks omitted).[3]  Accordingly, we limit our review to Pollack's malicious prosecution claim.

For a § 1983 malicious prosecution claim based on an alleged Fourth Amendment violation, the plaintiff must show: "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008). "Unlike a false arrest . . . claim, malicious prosecution concerns detention only after the institution of legal process." *Id.* at 798 (brackets and internal quotation marks omitted).  Thus, a plaintiff arrested with a warrant "can challenge the probable cause determination supporting the warrant's issuance," and a plaintiff arrested without a warrant can challenge the subsequent "judicial determination of probable cause" for an "extended restraint of liberty following arrest." *Id.* (internal quotation marks omitted).  In assessing probable cause, "the relevant question is whether a substantial probability existed that the suspect committed the crime, requiring something more

---

[3] In any event, the judicial deception claim fails for the same reason, discussed below, as the malicious prosecution claim—the existence of probable cause for the arrest, independent of the allegedly fabricated post-arrest interview. *See Snell v. Tunnell*, 920 F.2d 673, 698 (10th Cir. 1990) (noting "a plaintiff must establish that, but for the dishonesty, the challenged action would not have occurred" and that probable cause should be assessed by setting aside the alleged false information).

than a bare suspicion." *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) (internal quotation marks omitted). And when qualified immunity is raised as a defense, we ask only "whether there was *arguable* probable cause," such that "a reasonable officer *could* have believed that probable cause existed." *Id.* (emphasis added) (internal quotation marks omitted).

Because Pollack was arrested without a warrant, he challenges the state magistrate's post-arrest finding of probable cause, which was based on Detective Miller's probable cause affidavit. Pollack contests two paragraphs of the narrative in her affidavit, in which she summarizes her conversation with Rusnik after Pollack was arrested. He relies on two affidavits from Rusnik, in which she denied that this post-arrest conversation occurred and insists that she did not make the statements to Detective Miller that are in the narrative. *See* R. vol. 1 at 1259; R. vol. 3 at 100-01.

Setting aside the allegedly fabricated post-arrest interview, Detective Miller's narrative still supports the magistrate's determination and presents sufficient facts for a reasonable officer to have believed probable cause existed.[4] *See Wilkins*, 528 F.3d at 805 ("Where false statements have been relied on to establish probable cause, the existence of probable cause for § 1983 purposes is determined by setting aside the false information." (brackets and internal quotation marks omitted)). Among other things, Detective Miller explained that the alleged assault occurred on June 30, 2014, that Rusnik "left the home after the incident to stay with a friend and later was

---

[4] Because Pollack's malicious prosecution claim fails on the probable-cause element, we do not address his argument that the prosecution terminated in his favor.

9

convinced to call the police and report what happened to her," that Rusnik did not contact the police until July 5, and that an arrest was not made that day "[d]ue in part" to Rusnik's medical condition. R. vol. 2 at 87. She further stated that she spoke to Riley, Rusnik's "best friend," who: (1) "confirmed the day she picked up [Rusnik]"; (2) described Rusnik as being "very upset and . . . in shock"; (3) said Rusnik told her "how [Pollack] put his hands on her neck and squeezed so tight she had difficulty breathing"; and (4) stated she saw "how red [Rusnik's neck] was." *Id.*

Although Pollack questions Riley's motives and credibility, he has not shown that Detective Miller should have dismissed the information from Riley.[5] *See Romero v. Fay*, 45 F.3d 1472, 1476 & n.1 (10th Cir. 1995) (noting the plaintiff in a § 1983 case has the burden to show the officer did not rely on reasonably trustworthy information); *see also United States v. Patane*, 304 F.3d 1013, 1017 (10th Cir. 2002) ("[W]hen an average citizen tenders information to the police, the police should be permitted to assume that they are dealing with a credible person in the absence of special circumstances suggesting that such may not be the case." (internal quotation

---

[5] To the extent Pollack relies on an affidavit from David Medrud to cast doubt on Riley's version of the events, he fails to provide a proper record citation to such an affidavit, and in any event, he has not shown that Detective Miller was aware of any information from Medrud when she submitted her probable cause affidavit. *See McCarty v. Gilchrist*, 646 F.3d 1281, 1287 (10th Cir. 2011) ("Probable cause must be evaluated as of the events in question." (internal quotation marks omitted)). Further, to the extent Pollack argues that Detective Miller's interview with Riley occurred after the arrest and, thus, could not have supported probable cause, he appears to refer to a second phone call between Detective Miller and Riley. R. vol. 2 at 49. Regardless, Pollack did not raise this issue in district court and has not "argue[d] for plain error and its application on appeal," thus precluding review. *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1131 (10th Cir. 2011).

marks omitted)), *rev'd on other grounds*, 542 U.S. 630 (2004). And although Pollack contests Deputy Powell's report, including the accuracy of Rusnik's statements due to her medical condition, we confine our review to Detective Miller's probable cause affidavit, which does not incorporate or expressly address Deputy Powell's report. *See Wilkins*, 528 F.3d at 802, 805 (noting probable cause in a malicious prosecution case is assessed based on information conveyed to the judicial official).

Ultimately, a reasonable officer could have believed there was probable cause that Pollack committed the offense of second-degree assault, even excluding the disputed portion of Detective Miller's probable cause affidavit.[6] *See generally* Colo. Rev. Stat. § 18-3-203(1)(b) (defining second-degree assault as having the "intent to cause bodily injury to another person" and "caus[ing] such injury to any person by means of a deadly weapon"); *see also People v. Lee*, 476 P.3d 351, 358 (Colo. 2020) (noting prosecutors typically charged second-degree assault by strangulation under § 18-3-203(1)(b) prior to the adoption in 2016 of a subsection for strangulation). Detective Miller was entitled to qualified immunity on the malicious prosecution claim, and the district court properly granted summary judgment in her favor.

---

[6] In his amended reply brief, Pollack insists Detective Miller needed to show both probable cause and exigent circumstances. But he cites no authority requiring such an analysis for a malicious prosecution claim or a defense to such a claim based on qualified immunity, and "we cannot fill the void by crafting arguments and performing the necessary legal research," *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 841 (10th Cir. 2005) (internal quotation marks omitted).

## CONCLUSION

The district court's judgment is affirmed.

Entered for the Court

Mary Beck Briscoe
Circuit Judge