517 P.3d 1210
Cheryl Lynette PLEMMONS, Petitioner,
v.The PEOPLE of the State of Colorado, Respondent.
Supreme Court Case No. 21SC183 Supreme Court of Colorado.
September 26, 2022
Rehearing Denied October 17, 2022
Attorneys for Petitioner: Megan A. Ring, Public Defender, Jacob B. McMahon, Deputy Public Defender, Denver, Colorado
Attorneys for Respondent: Philip J. Weiser, Attorney General, Patrick A. Withers, Assistant Attorney General, Denver, Colorado
En Banc
JUSTICE HOOD delivered the Opinion of the Court, in which CHIEF JUSTICE BOATRIGHT, JUSTICE HART, JUSTICE SAMOUR, and JUSTICE BERKENKOTTER joined.
JUSTICE GABRIEL, joined by JUSTICE MÁRQUEZ, concurred in the judgment.
JUSTICE HOOD delivered the Opinion of the Court. ¶1 Defendant, Cheryl Plemmons, intentionally spat on two sheriff deputies while they were attempting to determine if she was suicidal. The deputies arrested her for spitting on them, and the prosecution charged her with three counts of second degree assault: one under section 18-3-203(1)(f.5), C.R.S. (2022), and two under section 18-3-203(1)(h). A jury found her guilty of each count.
¶2 On appeal, Plemmons argued that the trial court incorrectly instructed the jury on an element of the offense: the scope of the term "harm" as it relates to her intent in spitting on the officers. A division of the court of appeals affirmed the judgment of conviction. People v. Plemmons, 2021 COA 10, ¶ 2, 490 P.3d 1112, 1115.
¶3 Like the courts below, we hold that "harm" as used in subsections 18-3-203(1)(f.5)(I) and (h) encompasses more than just physical harm. Psychological harm can suffice. We agree with the division that the legislature, in using the term "harm," intended these subsections to criminalize as second degree assault prolonged psychological or emotional harm that stems from the possibility that an officer has been infected by or could become a vector for disease. Plemmons, ¶ 45, 490 P.3d at 1122. But we conclude that Plemmons is entitled to a new trial because the trial court's jury instructions didn't accurately convey the meaning of "harm" to the jury. Thus, we affirm in part and reverse in part the division's judgment.
I. Facts and Procedural History
¶4 Plemmons called a friend one evening to say she planned to commit suicide. Following an anonymous call from Plemmons's friend to the police, sheriff deputies Scott Blakely and Richard Paige conducted a welfare check at Plemmons's home.
¶5 Blakely and Paige found Plemmons at her home with another friend. Upon the deputies' entry into her home, Plemmons, who was visibly drunk, berated them and told them to leave. After calming down enough to talk to Paige, Plemmons said she had considered committing suicide by carbon monoxide poisoning and motioned toward her oven. She then added that she might slit her throat. At that point, she picked up a small knife. As both deputies reached for their tasers, Plemmons flung the knife across the room, away from the deputies but toward her friend.
¶6 The deputies handcuffed Plemmons and placed her in protective custody, which, Blakely explained at trial, meant they would transport her to a hospital for treatment. Because it was cold outside, the deputies began to help Plemmons put on her coat and boots. Plemmons then spat in both deputies' faces, causing the deputies to shift from taking Plemmons into protective custody to placing her under arrest.
¶7 The deputies put Plemmons in the back of Paige's patrol car. Despite the arrest, the deputies decided to first take Plemmons to a hospital for medical evaluation. On the way to the hospital, Plemmons continued to insult Paige, and she spat on him through the partition, hitting the side of his face and back of his head. As a result, the deputies placed a spit hood over Plemmons's head for the rest of the trip. After medical staff cleared Plemmons, Paige transported her to jail.
¶8 The prosecution charged Plemmons with two counts of second degree assault under section 18-3-203(1)(h) for the spitting incidents inside her home, and one count of second degree assault under section 18-3-203(1)(f.5) for spitting on Paige inside the patrol car.
¶9 As relevant here, section 18-3-203(1)(h) provides: A person commits the crime of assault in the second degree if: [w]ith intent to infect, injure, or harm another person whom the actor knows or reasonably should know to be engaged in the performance of his or her duties as a peace officer, ... he or she causes such person to come into contact with ... saliva ... by any means ....
(Emphasis added.) And section 18-3-203(1)(f.5)(I) defines second degree assault as:
While lawfully confined in a detention facility1 within this state, a person with intent to infect, injure, harm , harass, annoy, threaten, or alarm a person in a detention facility whom the actor knows or reasonably should know to be an employee of a detention facility, causes such employee to come into contact with ... saliva ... by any means ....2 (Emphasis added.)
¶10 Plemmons sought dismissal of the subsection (h) charges, arguing that the provision is unconstitutionally vague and overbroad. While the trial court denied the motion, it found the term "harm," as used in the statute, ambiguous. Therefore, the trial court turned to interpretive aids and concluded that the term means something different than "infect" or "injure" and that it is limited to psychological and emotional trauma stemming from unwanted contact with bodily fluids or dangerous substances.
¶11 Over Plemmons's objection, the trial court instructed the jury, in part, as follows:
The term "harm" ... means psychological or emotional harm. It can include the following
1. fear,
2. anxiety,
3. or other type of significant distress
that is based upon the danger of injury or infection from contact with the bodily fluids. The defendant need not have acted with the intent to cause harm that is permanent or long-lasting in nature, but the defendant's intent must have been to cause psychological or emotional harm that is not fleeting or minimal in nature.
¶12 The jury found Plemmons guilty as charged.
¶13 On appeal, Plemmons argued that the trial court erroneously instructed the jury on the definition of "harm" as it applied to all three convictions because the instruction: (1) deviated from the statutory text by adding psychological and emotional harm; (2) blurred the line between second degree assault under subsection (h) and third degree assault under section 18-3-204(1)(b), C.R.S. (2022)3 ; (3) invited the jury to speculate about the potential scope of the term "harm"; (4) left unclear whether the phrase "based upon the danger of injury or infection from contact with bodily fluids" modified all the listed examples of harm; and (5) left uncertain how serious an intended harm needed to be to fall within the statute. Plemmons, ¶ 43, 490 P.3d at 1121–22.
¶14 Plemmons also claimed that the evidence was insufficient to establish that she spat on the deputies with the intent to "infect, injure, or harm" them, as section 18-3-203(1)(h) requires. Plemmons, ¶ 33, 490 P.3d at 1120.
¶15 The division affirmed. Id. at ¶ 62, 490 P.3d at 1124. In rejecting Plemmons's jury instruction argument, it concluded: (1) the trial court's "construction of ‘harm’ was consistent with the General Assembly's intent"; (2) the court's definition of "harm" requires the psychological harm for second degree assault to be based "upon the danger of injury or infection from contact with bodily fluids"; (3) the jurors were not invited to speculate about applications beyond the bounds of the court's limiting instruction; (4) the structure of the instruction's second sentence makes clear that the phrase "based upon the danger of injury or infection from contact with bodily fluids" applies to all three examples included in that sentence; and (5) the jury instruction "can be administered clearly" because "clarifying that the harm associated with second degree assault need not be permanent, but also must be more than ‘fleeting or minimal in nature,’ helps differentiate ‘harm’ from the lesser injuries such as ‘alarm’ or ‘annoy’ that appear in the third degree assault statute." Id. at ¶¶ 44–48, 490 P.3d at 1122.
¶16 In rejecting Plemmons's sufficiency argument, the division examined evidence reflecting her mental state. Id. at ¶ 36, 490 P.3d at 1120. Plemmons acknowledged that she yelled at the deputies, directed demeaning language at them, and even implied that Paige and his family weren't safe. Id. Given evidence of Plemmons's demeanor and the circumstances leading to the charged acts, the division determined that there was sufficient evidence for the jury to conclude that Plemmons intended to inflict psychological or emotional harm on the deputies by spitting on them. Id. at ¶ 37, 490 P.3d at 1121.
¶17 We granted certiorari review.4 II. Analysis
A. "Harm" Instruction
1. Preservation
¶18 The prosecution argues that Plemmons forfeited her instructional error challenge. While it acknowledges that Plemmons objected to certain parts of the relevant jury instruction, it contends that she now argues for the first time that "harm" encompasses physical but not psychological or emotional injury. We are not persuaded. ¶19 A party forfeits an alleged error for appellate purposes—meaning that review is only for plain error—by "fail[ing] to make the timely assertion of a right." People v. Rediger, 2018 CO 32, ¶ 40, 416 P.3d 893, 902 (quoting United States v. Olano, 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) ). However, a party need not recite " ‘talismanic language’ to preserve particular arguments for appeal"; rather, it need only "present the trial court with ‘an adequate opportunity to make findings of fact and conclusions of law’ on the issue." Martinez v. People, 2015 CO 16, ¶ 14, 344 P.3d 862, 868 (quoting People v. Melendez, 102 P.3d 315, 322 (Colo. 2004) ). ¶20 Plemmons repeatedly argued to the trial court and on appeal that the legislature intended "harm" to mean just physical harm. She expressly asked the trial court to "just strike ‘harm’ ... from the statute because [the prosecutor] is saying that it means physically injure" and that was already covered by "infect or injure" in the statute. And the trial court directly responded to that argument. When discussing the instruction on "harm," the trial court expressly stated that it "d[idn't] think that harm mean[t] physical injury," but rather that, with this statute, the legislature was trying to address the "emotional distress" or "emotional damage" specifically related to the "distress," "panic," or "extreme concern" that a peace officer would be injured or infected by the bodily fluids in question.
¶21 Plemmons's arguments "allow[ed] the trial court a meaningful chance to prevent or correct the error and create[d] a record for appellate review." See Martinez, ¶ 14, 344 P.3d at 868. We conclude, therefore, that Plemmons didn't forfeit her instructional error challenge.
2. Standard of Review and Rules of Statutory Interpretation ¶22 "We review jury instructions de novo to determine whether they accurately inform the jury of the governing law." Hoggard v. People, 2020 CO 54, ¶ 12, 465 P.3d 34, 38. "In order to evaluate whether jury instructions properly state the law or are misleading, we ... must consider the criminal statutes themselves," which we also review de novo. Garcia v. People, 2022 CO 6, ¶ 16, 503 P.3d 135, 140. ¶23 Because it is "the prerogative of the legislature to define crimes and prescribe punishments," People v. Bott, 2020 CO 86, ¶ 8, 477 P.3d 137, 139, when "construing a statute, our primary purpose is to ascertain and give effect to the legislature's intent," McCoy v. People , 2019 CO 44, ¶ 37, 442 P.3d 379, 389. To do so, we give the statute's "words and phrases their plain and ordinary meanings," and we "read statutory words and phrases in context." Id. "We must also endeavor to effectuate the purpose of the legislative scheme ... read[ing] that scheme as a whole[;] giving consistent, harmonious, and sensible effect to all of its parts[;] and ... avoid[ing] constructions that would render any words or phrases superfluous ...." Id. at ¶ 38, 442 P.3d at 389. If the statute is unambiguous, "we apply it as written." People v. Jones, 2020 CO 45, ¶ 54, 464 P.3d 735, 746. But if the language is susceptible of more than one reasonable interpretation, it is ambiguous, and we may use extrinsic aids of construction. Id. at ¶ 55, 464 P.3d at 746. ¶24 In interpreting ambiguous statutes, we are further directed, if possible, to avoid interpretations that would render the statute unconstitutional. United States v. Davis, ––– U.S. ––––, 139 S. Ct. 2319, 2332 n.6, 204 L.Ed.2d 757 (2019) ; People v. Ross, 2021 CO 9, ¶ 35 n.6, 479 P.3d 910, 917 n.6. And we are mindful that although "Colorado's guarantee of equal protection is violated where two criminal statutes proscribe identical conduct, yet one punishes that conduct more harshly," People v. Lee, 2020 CO 81, ¶ 14, 476 P.3d 351, 354 (quoting Dean v. People, 2016 CO 14, ¶ 14, 366 P.3d 593, 597 ), "equal protection is not violated so long as the legislative classification is not arbitrary or unreasonable, and the differences in the provisions bear a reasonable relationship to the public policy to be achieved," Dean , ¶ 16, 366 P.3d at 598.
3. Interpretation of "Harm" in Section 18-3-203 ¶25 The statute doesn't define the term "harm," and the term hasn't acquired a technical or particularized meaning. Therefore, we must read "harm" in context and construe it according to the rules of grammar and its common usage. § 2-4-101, C.R.S. (2022). To do so, "we may consider a definition in a recognized dictionary." Cowen v. People, 2018 CO 96, ¶ 14, 431 P.3d 215, 218. Merriam-Webster defines "harm" as "to damage or injure physically or mentally." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/harm [https://perma.cc/AD26-WZLN]. Thus, the term's common usage suggests more than just physical harm.
¶26 And putting the term in context doesn't necessarily clarify its meaning. "Harm" is preceded by the terms "infect" and "injure." Some definitions of both terms suggest physicality.5 See Merriam-Webster Dictionary, https:// www.merriam-webster.com/dictionary/infect [https://perma.cc/27UK-BYGL] (providing the first definition of "infect" as "to contaminate with a disease-producing substance or agent (such as a bacteria)"); Merriam-Webster Dictionary, https://www.merriam-webster.com/ dictionary/injure [https://perma.cc/NE23-GVNJ] (providing the first definition of "injure" as "to inflict bodily hurt on"). More modern definitions, however, surpass mere physicality. See Infect, Merriam-Webster Dictionary, supra (defining "infect" as "to work upon or seize upon so as to induce sympathy, belief, or support," as in "trying to infect their salespeople with their enthusiasm"); Injure, Merriam-Webster Dictionary, supra (defining "injure" as "to harm, impair, or tarnish the standing of," as in "injured his reputation"; "to give pain to," as in "injure a person's pride"; or "to do an injustice to"). ¶27 Thus, although physicality is one way the legislature could have distinguished the intended effects listed in section 18-3-204(1)(b) —"harass, annoy, threaten, or alarm"—from those listed in section 18-3-203(1)(h) to avoid violating Colorado's equal protection guarantee, the statute's plain language doesn't clearly suggest that it did. Accordingly, we agree with the division that "harm," as it appears in subsections 18-3-203(1)(f.5)(I) and (h), is ambiguous because it is susceptible of more than one reasonable interpretation, including physical, emotional, or psychological damage. See Plemmons, ¶ 22, 490 P.3d at 1118. We therefore turn to extrinsic aids to guide our interpretation.
a. Legislative History ¶28 Legislative history—"the development of a statute during the legislative process and prior to enactment or amendment," Colo. Oil & Gas Conservation Comm'n v. Martinez, 2019 CO 3, ¶ 30 n.2, 433 P.3d 22, 29 n.2 —can illuminate legislative intent. People v. Sprinkle, 2021 CO 60, ¶ 22, 489 P.3d 1242, 1246.
¶29 In 1997, the legislature considered what is now section 18-3-203(1)(f.5), the provision classifying as second degree assault the intentional use of an individual's bodily fluids against a detention facility employee when that individual is lawfully confined in a detention facility. Ch. 270, sec. 1, § 18-3-203, 1997 Colo. Sess. Laws, 1591, 1591-92.
¶30 The committee's debate focused largely on the trauma caused by uninvited contact with another's bodily fluids. Legislators made comparisons to physical afflictions in order to highlight the danger posed by these encounters. Bill sponsor Representative Larry Schwarz contended that intentionally exposing detention facility staff to potentially pathogenic bodily fluids (then a misdemeanor) was worse than breaking a staff member's nose (a felony). Hearing on H.B. 1186 before the H. Judiciary Comm., 61st Gen. Assemb., 1st Sess. (Feb. 4, 1997); see also Vensor v. People, 151 P.3d 1274, 1279 (Colo. 2007) ("While by no means conclusive, the testimony of a bill's sponsor concerning its purpose and anticipated effect can be powerful evidence of legislative intent."). Representative Stephen Tool echoed this sentiment, noting that the impact of being spat on can be "so much worse than even a physical assault." Hearing on H.B. 1186 before the H. Judiciary Comm., supra. Such comparisons suggest that the legislature's focus wasn't on the physical damage stemming from such assaults, but from the emotional or psychological toll of not knowing the extent of the damage for some time.
¶31 Senator Richard Mutzebaugh explicitly observed that "injure" and "harm" already appeared in the second-degree-assault statute. Id. In 1997, as in the current statutory scheme, section 18-3-203(1)(e) defined "harm" to include "physical or mental impairment." (Emphasis added.) Senator Mutzebaugh seems to have grounded subsection (1)(f.5)'s use of "harm" in subsection (1)(e)'s definition, which expressly covered more than just physical harm. Hearing on H.B. 1186 before the H. Judiciary Comm., supra ; see, e.g., McCulley v. People, 2020 CO 40, ¶ 32, 463 P.3d 254, 261 (construing the terms "conviction" and "convicted" consistently throughout section 16-22-113(3), C.R.S. (2022)'s various subsections).
¶32 Thus, upon this provision's adoption, legislators seemed to have accepted a definition for the term "harm" that embraced more than just physical damage.
b. Statutory History
¶33 We've also recognized that a provision's statutory history—the "evolution of a statute as it is amended over time by the legislature," Colo. Oil & Gas Conservation Comm'n , ¶ 30 n.2, 433 P.3d at 29 n.2 —"informs our understanding of legislative intent." Id. at ¶ 31, 433 P.3d at 30.
¶34 In 2009, the legislature expanded the assault statute's protected personnel beyond the walls of detention facilities. The new provision, section 18-3-204(1)(b), classified as misdemeanor third degree assault the same conduct prohibited in subsection -203(1)(f.5)(I), including a mirror recitation of the intent element from the original provision—the "intent to infect, injure, harm, harass, annoy, threaten, or alarm," perpetrated against peace officers, firefighters, or emergency medical technicians. Ch. 305, sec. 1, § 18-3-204, 2009 Colo. Sess. Laws 1649, 1649-50. And again, during a House Judiciary Committee Hearing on the bill, legislators' focus turned to the psychological trauma caused by this sort of assault. Hearing on H.B. 1120 before the H. Judiciary Comm., 67th Gen. Assemb., 1st Sess. (Jan. 29, 2009). While the discussion referred to conduct amounting to third degree assault, this iteration of the statute included all the intended effects. Therefore, again, legislators appear to have associated emotional trauma with the consequences this statutory text aims to prevent.
¶35 And most recently, in 2015, legislators increased the penalty for this conduct outside of detention facilities and bifurcated the intent element, resulting in the scheme we see today. Ch. 337, secs. 2-3, §§ 18-3-203, - 204, 2015 Colo. Sess. Laws 1366, 1366-67. Echoing comments from the provision's legislative history, Senator John Cooke, one of the sponsors for the 2015 bill, introduced the text by explaining that forced contact with bodily fluids often does "more damage than ... physical damage because of the psychological damage" of potentially "contracting a communicable disease." Hearing on S.B. 67 before the S. Judiciary Comm., 70th Gen. Assemb., 1st Sess. (Jan. 28, 2015).
¶36 It was a last-minute, friendly amendment to the 2015 proposal that bifurcated the list of intended effects because of concerns of "overstretch": that too much conduct would be classified as a felony. 2d Reading on S.B. 67 before the H., 70th Gen. Assemb., 1st Sess. (May 4, 2015) (statements of Reps. Mike Foote and Yeulin Willett). During a House Judiciary Committee Hearing, Representative Willett expressed concern with the original text of the proposed amendment because of the low bar for the intent to "harass, annoy, threaten, or alarm." Hearing on S.B. 67 before the H. Judiciary Comm., 70th Gen. Assemb., 1st Sess. (Apr. 28, 2015). He reasoned, for example, that spitting on an officer's boots could meet this threshold. Id. While such conduct is likely disturbing, committee members seemed to agree that spitting on someone's boot shouldn't support a felony assault charge, akin to manslaughter and vehicular assault. Id. (statements of Reps. Willet and Joseph Salazar). So, the legislators divided the list of intended effects between second and third degree assault, with "intent to infect, injure, or harm" constituting felony second degree assault and "intent to harass, annoy, threaten, or alarm" constituting misdemeanor third degree assault. 2d Reading on S.B. 67 before the H., supra; see also §§ 18-3-203(1)(h), (2)(a)-(b.5), - 204(1)(b), (3).
¶37 This division wasn't based on physicality, but rather on the severity of the intended consequences of the assault. The legislature reaffirmed its objective: to prevent individuals from causing others to suffer physical or emotional damage by exposing them to bodily fluids. See, e.g., Hearing on S.B. 67 before the H. Judiciary Comm., supra (statements of Reps. Willet; Salazar; and Janak Joshi, bill sponsor). Legislators reasoned that these consequences emanated from, for example, being spat on in the face but not on the boots. Id. (statements of Reps. Willet, Salazar, and Foote). Thus, the legislative and statutory histories suggest that the legislature divided second and third degree assault based on the severity of the intended effects rather than along a physical-psychological divide.
c. The Statutory Scheme and Context
¶38 In section 18-3-203(1)(h), the legislature provided a list of proscribed intended effects: "infect, injure, or harm." To avoid rendering any word in that list superfluous, we must assume the legislature intended for each to have a different meaning. Rediger, ¶ 22, 416 P.3d at 899 ("[T]he use of different terms signals an intent on the part of the General Assembly to afford those terms different meanings." (quoting Robinson v. Colo. State Lottery Div., 179 P.3d 998, 1010 (Colo. 2008) )).
¶39 As noted above, Merriam-Webster defines "infect" as "to contaminate with a disease-producing substance or agent (such as a bacteria)." Infect, Merriam-Webster Dictionary, supra. And it defines "injure" as "to inflict bodily hurt on" and "to do an injustice to." Injure, Merriam-Webster Dictionary, supra. "Harm" should therefore be interpreted, to the extent reasonable, to encompass something more. ¶40 In arguing that "harm" means strictly physical harm, Plemmons acknowledges that her construction renders the term "harm" superfluous. She further recognizes that the canon against surplusage is a "time-honored proposition," but points out that this court has previously observed that "the superfluity principle, like all canons of construction, is merely an interpretive aid, not an absolute rule." See Benefield v. Colo. Republican Party, 2014 CO 57, ¶¶ 16–17, 329 P.3d 262, 267. She argues statutory schemes often contain redundancies and, if faced with the choice between a plain-text reading rendering a word superfluous and an interpretation giving each word meaning but muddying the clarity of a statute, courts should embrace the former. See Barton v. U.S. Att'y Gen., 904 F.3d 1294, 1301 (11th Cir. 2018), aff'd , ––– U.S. ––––, 140 S. Ct. 1442, 1453-54, 206 L.Ed.2d 682 (2020) ; see also Rimini St., Inc. v. Oracle USA, Inc., ––– U.S. ––––, 139 S. Ct. 873, 881, 203 L.Ed.2d 180 (2019) ("Sometimes the better overall reading of the statute contains some redundancy."). ¶41 Meanwhile, the prosecution makes efforts to avoid any equal protection problem that the division's judgment potentially creates. The only difference between the criminalized conduct of second and third degree assault in sections 18-3-203(1)(h) and 18-3-204(1)(b), respectively, is the intended effect of the defendant's conduct; that is, the defendant's subjective mental state. And "separate statutes proscribing with different penalties what ostensibly might be different acts, but offering no intelligent standard for distinguishing the proscribed conduct, run afoul of equal protection under state constitutional doctrine." Lee, ¶ 14, 476 P.3d at 354 (quoting People v. Marcy, 628 P.2d 69, 75 (Colo. 1981), superseded by statute, § 18-3-102(1)(d), C.R.S. (1986) ). The prosecution argues that the definitions of "harass," "annoy," "threaten," and "alarm" (the intended effects of third degree assault) critically have one thing in common: they don't imply an intent to cause substantial—meaning long-term and reasonably serious—affliction.
¶42 The prosecution therefore urges us to read a threshold requirement into the language in subsection (h): the impact on the peace officer must be a substantial affliction, either physical or psychological. This is essentially the interpretation the division adopted in concluding that the legislature's use of "harm" in subsections 18-3-203(1)(f.5)(I) and (h) evinces an intent to criminalize a particular kind of trauma inflicted upon peace officers: prolonged psychological or emotional harm that stems from the possibility that the officer has been infected by or could become a vector for disease. See Plemmons, ¶¶ 45, 48, 490 P.3d at 1122 (reasoning that the trial court's definition of "harm" didn't blur the definition between second and third degree assault because harm for second degree assault "must necessarily be based ‘upon the danger of injury or infection from contact with bodily fluids’ " and that the harm "must be more than ‘fleeting or minimal in nature’ "). ¶43 Like the prosecution's proposed use of "substantial," the trial court's and the division's focus on less-fleeting harm serves the legislative objective we identified above. We conclude that it is a defendant's intent to cause prolonged damage—whether physical, psychological, emotional, or some combination of all three—rather than temporary shock or minor discomfort that elevates identical conduct from a misdemeanor to a felony in this context. This distinction avoids equal protection problems because it is " ‘sufficiently pragmatic’ to ‘permit an intelligent and uniform application of the law.’ " See Lee, ¶ 14, 476 P.3d at 354 (quoting Marcy, 628 P.2d at 78 ).
4. Application to the Trial Court's Jury Instruction ¶44 We now turn to the jury instruction defining "harm." As you'll recall, the trial court defined "harm" to encompass "psychological or emotional harm" that "can include ... 1. fear, 2. anxiety, 3. or other type of significant distress that is based upon the danger of injury or infection from contact with ... bodily fluids."
¶45 Critically, this instruction provided that psychological or emotional harm can, but (presumably) need not, be based on fear of infection or injury. So it could have led a reasonable juror to believe that "harm" encompasses any type of significant distress and that harm based on the fear of disease was merely one example of such distress. In this context however, "harm" must flow from a very particular form of significant distress; namely, the fear of disease because of uninvited exposure to another's bodily fluids. The trial court erred in allowing the jury to infer otherwise. ¶46 Because the trial court misinstructed the jury on an element of the charged offenses, and because the issue was preserved, we review that error for constitutional harmlessness. Griego v. People, 19 P.3d 1, 8 (Colo. 2001) ; Garcia, ¶¶ 15, 18, 503 P.3d at 140 (explaining that, to safeguard the constitutional right of criminal defendants to be presumed innocent until a jury has found them guilty beyond a reasonable doubt, trial courts are required to properly instruct juries on all elements of the charges against them). "If there is even a ‘reasonable possibility that the error might have contributed to the conviction,’ we must reverse." Garcia , ¶ 18, 503 P.3d at 140 (quoting Hagos v. People, 2012 CO 63, ¶ 11, 288 P.3d 116, 119 ).
¶47 While the trial court's "harm" instruction applied to the charges under both subsection (f.5) and (h), the varying lists of intended effects in each render the instruction's impact distinguishable. Thus, we take each subsection in turn. ¶48 First, subsection (f.5). As you'll recall, section 18-3-203(1)(f.5)(I) retains the broad list of intended effects: "intent to infect, injure, harm, harass, annoy, threaten, or alarm." To convict Plemmons of this charge, the prosecution wasn't constrained to proving that Plemmons intended to "harm" Paige. And during closing arguments, the prosecution reminded the jury several times of the expanded list of intended effects under subsection (f.5)(I), likely assuring that the jury kept these other intended effects in mind. ¶49 Within the confines of the police vehicle, Plemmons intentionally spat on the side of Paige's face and the back of his head. This conduct, along with her string of insults—for example, threatening that Paige would be lucky if he and his family were alive in a month—reasonably evince an intent to harass,6 annoy,7 threaten,8 or alarm.9 ¶50 We conclude that a reasonable jury could find Plemmons guilty under these less severe intended effects, and thus, the instructional error was harmless beyond a reasonable doubt with regard to Plemmons's second-degree-assault conviction under section 18-3-203(1)(f.5). ¶51 Moving to subsection (h), we confront the question of whether Plemmons intended to "harm" the deputies.
¶52 Because the jury instruction didn't confine the jurors' deliberation to prolonged psychological and emotional distress stemming from potential infection, it invited juror speculation and could have led to their reliance on considerations outside the scope of the proscribed conduct. We can't be confident beyond a reasonable doubt that the erroneous instruction didn't contribute to the convictions. See Garcia , ¶ 18, 503 P.3d at 140. We therefore vacate Plemmons's two convictions under section 18-3-203(1)(h).
B. Sufficiency of the Evidence ¶53 Plemmons also challenges her subsection (h) convictions for lack of sufficient evidence. "[I]f a defendant is entitled to reversal of her convictions on appeal due to insufficient evidence, the guarantees against double jeopardy in the United States and Colorado Constitutions may preclude retrial." McDonald v. People, 2021 CO 64, ¶ 61, 494 P.3d 1123, 1134 (quoting People v. Coahran, 2019 COA 6, ¶ 40, 436 P.3d 617, 626 ). ¶54 While "[d]ouble jeopardy principles ‘prohibit[ ] a retrial where an appellate court reverses a conviction solely for lack of sufficient evidence to sustain the jury's verdict,’ " id. at ¶ 62, 494 P.3d at 1134 (second alteration in original) (quoting People v. Brassfield, 652 P.2d 588, 594 n.5 (Colo. 1982) ), "the government is not precluded from ‘retrying a defendant whose conviction is set aside because of an error in the proceedings leading to conviction,’ " id. at ¶ 63, 494 P.3d at 1134 (quoting Burks v. United States, 437 U.S. 1, 14, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) ). This is because "reversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case," but rather "it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect, e. g., ... incorrect instructions." Burks , 437 U.S. at 15, 98 S.Ct. 2141 ; see Garcia, ¶ 1, 503 P.3d at 138 (remanding for a new trial where the trial court misinstructed the jury on an element of the charge); Castillo v. People, 2018 CO 62, ¶ 66, 421 P.3d 1141, 1152 (remanding for a new trial where the trial court erroneously gave superfluous jury instructions). ¶55 We "decline to speculate on whether a properly instructed jury would have found that the prosecution met its burden of proof" for the section 18-3-203(1)(h) charges levied against Plemmons. See McDonald, ¶ 67, 494 P.3d at 1135. "[W]hether or not the Government will be able to carry its burden of proof on retrial, the fact remains that retrial is the Government's first ‘bite at the apple’ to prove its case under the correct legal standard." Id. (quoting United States v. Harrington, 997 F.3d 812, 818 (8th Cir. 2021) ).
III. Conclusion
¶56 We affirm in part and reverse in part the division's judgment. We affirm Plemmons's conviction under section 18-3-203(1)(f.5), vacate her two convictions under section 18-3-203(1)(h), and remand the case for a new trial on those charges.
JUSTICE GABRIEL, joined by JUSTICE MÁRQUEZ, concurring in the judgment.
¶57 The majority concludes that "harm," as that word is used in sections 18-3-203(1)(f.5)(I) and 18-3-203(1)(h), C.R.S. (2022), means "prolonged psychological or emotional harm that stems from the possibility that an officer has been infected by or could become a vector for disease." Maj. op. ¶ 3. The majority further concludes that because the trial court's jury instruction defining the meaning of "harm" did not accurately convey the meaning of that term, the judgments of conviction must be reversed. Id.
¶58 Although I agree that the definitional instruction given by the trial court was reversible error, I cannot agree with the definition of "harm" that the majority adopts. That definition finds no support in the text of sections 18-3-203(1)(f.5)(I) or 18-3-203(1)(h), particularly to the extent that the majority adds to the statutory text a durational element of the intended harm (i.e., "prolonged"). In addition, although the majority suggests that the definition that it adopts is true to the legislature's concern for the effect on the victim, see Maj. op. ¶¶ 3, 30, in the actual statutory text, "harm" concerns the actor's mens rea, not the effect on the victim. And in my view, the majority's definition exposes these provisions to multiple constitutional challenges.
¶59 Accordingly, I cannot subscribe to the definition of "harm" that the majority adopts, and therefore I respectfully concur in the judgment, only. I. Factual Background
¶60 I agree with the majority's recitation of the pertinent facts and will not repeat all of those facts here. Because it is relevant to my analysis of the sufficiency of the evidence in this case, however, I briefly note the following evidence relating to Plemmons's mental state when she spat on Deputies Blakely and Paige.
¶61 It is undisputed that on the evening at issue, Plemmons called a friend and told the friend that she was going to kill herself that night. Deputies Blakley and Paige responded to Plemmons's home after the police received an anonymous call about a suicidal woman.
¶62 Upon their arrival, the deputies found Plemmons to be highly agitated, and she appeared to them to be intoxicated. As they entered her home, she immediately began yelling and swearing at them. For her part, Plemmons said that when she saw the deputies, she became "instantly terrified" because her worst fear was going to jail. She thus repeatedly asked the deputies to leave.
¶63 Ultimately, Plemmons engaged in conversation with the deputies. According to the deputies, when one of them asked Plemmons how she was planning to kill herself, she pointed to her open oven and said that she might kill herself with carbon monoxide. She also said that she might just slit her throat, at which point she picked up a small penknife. The deputies reacted defensively to this, and Plemmons flung the knife across the room. The deputies then placed Plemmons in protective custody and handcuffed her, which caused her to become highly agitated once more.
¶64 Before transporting Plemmons in the cold weather, the deputies located a coat and boots for her and began to dress her. While they were doing so, Plemmons spat in Deputy Blakley's face and allegedly spat in Deputy Paige's face, as well. At that point, the deputies told Plemmons that she would be charged with assault on a police officer, and the protective custody became an arrest. The deputies then placed Plemmons in Deputy Paige's marked patrol car for transport to Mercy Medical Center.
¶65 During the drive to the medical center, Plemmons yelled insults and spat on Deputy Paige, at which point the deputy put a spit hood over Plemmons's head. While in the car, Plemmons told Deputy Paige that she hated him, and she made a number of religiously themed comments, including telling the deputy to repent, that God was going to take him out, that his wife did not deserve to die from his sins, and that he would be "going to Hell, like next week."
¶66 Plemmons was subsequently cleared at the medical center, and she was transported to the jail and later charged with, as pertinent here, two counts of second degree assault under section 18-3-203(1)(h) for spitting on the deputies while they were in her home and one count of second degree assault under 18-3-203(1)(f.5)(I) for spitting on Deputy Paige in the patrol car.
¶67 It appears undisputed that Plemmons had no infectious diseases at the time of the incident at issue, and she consistently and repeatedly denied that she had any intent to injure or harm either of the deputies. Rather, she said that she was just hoping to "cause them to stop and think about what they were doing." As she put it, her message was, "[P]lease don't hurt me, please don't take me to jail, how can this be happening to someone who's suicidal." No witness testified to the contrary, and neither Deputy Blakley nor Deputy Paige testified that he had concerns for his own health, either long-term or short-term.
¶68 At oral argument, the People conceded that if "harm," within the meaning of section 18-3-203(1)(h), were defined in terms of physical harm, as Plemmons suggests it should be, then no evidence would support Plemmons's convictions under that provision.
II. Analysis
¶69 I begin by discussing the applicable standards of review and principles of statutory interpretation. I then proceed to discuss the definition of "harm" that the majority adopts, explaining why I believe it to be unfounded and constitutionally unsound. Next, I discuss what I believe to be a more appropriate interpretation of sections 18-3-203(1)(f.5)(I) and 18-3-203(1)(h). I end with a respectful call for legislative action to address the multiple constitutional problems posed by these provisions.
A. Standard of Review and Principles of Statutory Interpretation
¶70 We review issues of statutory interpretation de novo. McCoy v. People, 2019 CO 44, ¶ 37, 442 P.3d 379, 389.
¶71 In construing a statute, we seek to ascertain and give effect to the General Assembly's intent. Id. To do so, we look first to the statutory language, giving its words and phrases their plain and ordinary meanings. Id. We read such words and phrases in context, and we construe them according to the rules of grammar and common usage. Id. Additionally, we "endeavor to effectuate the purpose of the legislative scheme." Id. at ¶ 38, 442 P.3d at 389. In doing so, we read that scheme as a whole, giving consistent, harmonious, and sensible effect to all of its parts, and we avoid constructions that would render any words or phrases superfluous or lead to illogical or absurd results. Id. We do not add words to a statute or subtract words from it. Turbyne v. People, 151 P.3d 563, 567 (Colo. 2007).
¶72 If the statute is unambiguous, then we apply it as written. McCoy , ¶ 38, 442 P.3d at 389. If the statute is ambiguous, however, then we may consider other aids to statutory construction, including the consequences of a given construction, the end to be achieved by the statute, and the statute's statutory and legislative history. See id. ; see also Colo. Oil & Gas Conservation Comm'n v. Martinez, 2019 CO 3, ¶ 30 & n.2, 433 P.3d 22, 29 & n.2 (noting that "statutory history" refers to a statute's evolution as it is amended over time by the legislature, whereas "legislative history" refers to a statute's development during the legislative process). We may also consider principles of construction such as ejusdem generis, which provides that when general terms follow a list of items in a statute, "the general terms are applied only to those things of the same general kind or class as those specifically mentioned." Winter v. People, 126 P.3d 192, 195 (Colo. 2006). And we may apply the doctrine of constitutional avoidance, under which we endeavor to interpret ambiguous statutes so as to avoid rendering them unconstitutional. People v. Ross, 2021 CO 9, ¶ 35 & n.6, 479 P.3d 910, 917 & n.6.
¶73 "A statute is ambiguous when it is reasonably susceptible of multiple interpretations." McCoy, ¶ 38, 442 P.3d at 389.
B. Majority's Interpretation of "Harm"
¶74 Section 18-3-203(1) provides, in pertinent part, that a person commits second degree assault if:
(f.5)(I) While lawfully confined in a detention facility within this state, a person with intent to infect, injure, harm, harass, annoy, threaten, or alarm a person in a detention facility whom the actor knows or reasonably should know to be an employee of a detention facility, causes such employee to come into contact with blood, seminal fluid, urine, feces, saliva, mucus, vomit, or any toxic, caustic, or hazardous material by any means, including but not limited to throwing, tossing, or expelling such fluid or material.
....
(h) With intent to infect, injure, or harm another person whom the actor knows or reasonably should know to be engaged in the performance of his or her duties as a peace officer, a firefighter, an emergency medical care provider, or an emergency medical service provider, he or she causes such person to come into contact with blood, seminal fluid, urine, feces, saliva, mucus, vomit, or any toxic, caustic, or hazardous material by any means, including by throwing, tossing, or expelling such fluid or material[.]
(Emphases added.)
¶75 I agree with the majority's determination that the term "harm," as it is used in these provisions, is ambiguous. See Maj. op. ¶ 27. As a result, I further agree that we may look to the above-noted aids to statutory construction. Id. In my view, however, none of these tools of construction supports the majority's conclusion that "harm" means "prolonged psychological or emotional harm that stems from the possibility that an officer has been infected by or could become a vector for disease." Id. at ¶ 3.
¶76 As an initial matter, I note that nothing in the text of sections 18-3-203(1)(f.5)(I) or 18-3-203(1)(h) says anything about the duration of any harm, much less that the harm must be "prolonged." See Maj. op. ¶ 3. Nor do these provisions criminalize causing a particular effect on a peace officer or other victim, which appears to be the focus of the majority's construction. See id. at ¶¶ 3, 30. Instead, the term "harm," as used in these provisions, refers solely to the actor's mens rea (i.e., the intent to infect, injure, or harm), not to the impact on the victim of the actor's conduct. See §§ 18-3-203(1)(f.5)(I), (h).
¶77 In addition, in my view, the majority's interpretation finds no support in the statutory or legislative history of these provisions. Before 2015, section 18-3-204(1)(b) provided that a person committed the crime of third degree (misdemeanor) assault if the person, "with intent to infect, injure, harm, harass, annoy, threaten, or alarm" someone whom the actor knew or reasonably should have known to be a peace officer, caused the officer to come into contact with saliva or other bodily fluids. Ch. 337, sec. 3, § 18-3-204(1)(b), 2015 Colo. Sess. Laws 1366, 1367. In 2015, the General Assembly removed the terms "infect," "injure," and "harm" from the third degree assault statute and added them to a new subsection of section 18-3-203, which defined second degree (felony) assault. Ch. 337, sec. 2, § 18-3-203(1)(h), 2015 Colo. Sess. Laws 1366, 1366-67. Under the new provision, which is the principal subsection now before us, a person commits second degree assault if, "[w]ith intent to infect, injure, or harm" another whom the actor knows or reasonably should know to be a peace officer, the person causes the peace officer to come into contact with saliva or other bodily fluids. § 18-3-203(1)(h).
¶78 Although an earlier draft of the bill that amended the above-quoted statutes would have reclassified as a felony any spitting on a peace officer with the intent to injure, infect, harm, harass, annoy, threaten, or alarm, S.B. 15-067, 70th Gen. Assemb., 1st Reg. Sess. (Colo. 2015) (as introduced in Senate, Jan. 14, 2015), legislators accepted amendments on the House floor intended to prevent "over-reaching" and making conduct such as "spitting on the boots" of an emergency responder a felony, 2nd Reading on S.B. 15-067 before the H., 70th Gen. Assemb., 1st Reg. Sess. (May 4, 2015).
¶79 In splitting the original third degree assault statute and increasing the severity of the punishment for, among other things, spitting on a peace officer with the intent to "infect, injure, or harm," Senator John Cooke, one of the bill's co-sponsors, explained that his intent was to account for the psychological trauma that could arise from unwanted contact with bodily fluids. As he explained, "[T]he reason that I felt that [accounting for emotional or psychological harm] was important is because, a lot of times that has more damage than the physical ... damage, because of the ... psychological damage of ... later on, you could be contracting a communicable disease." Hearings on S.B. 15-067 before the S. Judiciary Comm., 70th Gen. Assemb., 1st Reg. Sess. (Jan. 28, 2015).
¶80 Nothing in this statutory or legislative history suggests a concern for "prolonged" harm. Rather, the legislators' comments suggest a desire to punish an offender more severely for intending to cause a peace officer psychological trauma (e.g., fear of contracting a communicable disease) as a result of coming into contact with bodily fluids than for acting with the intent to cause lesser annoyances (e.g., the annoyance caused by a person's spitting on the officer's boots). But even assuming a legislative intent to address either "prolonged" harm or the effect of an actor's conduct on a peace officer, the statute that the legislature enacted does not actually address these purported concerns. As noted above, nothing in sections 18-3-203(1)(f.5)(I) or 18-3-203(1)(h) incorporates the notion of causing psychological trauma based on contact with bodily fluids. Indeed, the only reference to causation in the statute relates to causing a peace officer or a detention facility employee to come into contact with the actor's bodily fluids. And to the extent that the word "harm" is used, it is used in the context of describing the actor's mens rea, not any effect on the victim. We are, of course, not at liberty to rewrite a statute in order to accomplish what we might believe the legislature was seeking to achieve but did not actually enact. See Turbyne, 151 P.3d at 567.
¶81 Lastly, in my view, the majority's interpretation creates a number of constitutional infirmities.
¶82 We have recognized that a statute is unconstitutionally vague and therefore void when it "forbids or requires the doing of an act in terms so vague that persons of ordinary intelligence must necessarily guess as to its meaning and differ as to its application." People v. Becker, 759 P.2d 26, 31 (Colo. 1988).
¶83 In addition, we have long observed that Colorado's equal protection guarantee is violated when two criminal statutes proscribe identical conduct, yet one punishes that conduct more harshly. People v. Lee, 2020 CO 81, ¶ 14, 476 P.3d 351, 354. Along the same lines, we have said that "separate statutes proscribing with different penalties what ostensibly might be different acts, but offering no intelligent standard for distinguishing the proscribed conduct, run afoul of equal protection under state constitutional doctrine." People v. Marcy, 628 P.2d 69, 75 (Colo. 1981). Thus, to overcome an equal protection challenge to a statute, "the statutory classification must turn on ‘reasonably intelligible standards of criminal culpability,’ and any definition of a crime must be ‘sufficiently coherent and discrete that a person of average intelligence can reasonably distinguish it from conduct proscribed by other offenses.’ " People v. Griego, 2018 CO 5, ¶ 36, 409 P.3d 338, 344 (quoting Marcy, 628 P.2d at 80-81 ).
¶84 Here, the definition of "harm" that the majority adopts creates substantial vagueness and equal protection problems. As to the former, the majority provides no guidance as to what "prolonged" means in this context, nor is it at all clear how a prosecutor or fact-finder would be able to discern when a defendant intended prolonged harm, as opposed to harm of a non-prolonged nature. And regarding equal protection, the majority's definition creates substantial overlap between second degree assault (a felony) under sections 18-3-203(1)(f.5)(I) and 18-3-203(1)(h), which the majority construes as subsuming spitting on a peace officer with the intent to cause prolonged emotional harm, and third degree assault (a misdemeanor) under section 18-3-204(1)(b), which makes it a crime to spit on a peace officer with the intent to, among other things, threaten or alarm the officer. Accordingly, in my view, the majority's definition of "harm" is not sufficiently coherent and discrete to allow a person of average intelligence to be able to distinguish the conduct proscribed by the second degree assault statute from that proscribed by the third degree assault statute. As a result, the majority's definition affords prosecutors substantial discretion to charge the very same conduct as either a felony or a misdemeanor, with no discernible standard for distinguishing one from the other, in violation of the equal protection principles set forth above.
¶85 For all of these reasons, I cannot subscribe to the definition of "harm" that the majority adopts today.
C. A More Well-Founded Interpretation of "Harm"
¶86 This, of course, leaves the question of what "harm" means for purposes of the second degree assault statute. Although, for the reasons that the majority states (and that I note above), the statutory language is ambiguous, I believe that the text and the applicable tools of statutory construction support the interpretation proffered by Plemmons, namely, that second degree assault under section 18-3-203(1)(h) criminalizes spitting on peace officers with the intent to cause physical harm, whereas third degree assault criminalizes doing so with the intent to cause emotional or psychological harm. I reach this conclusion for several reasons.
¶87 First, this interpretation is supported by the statutory text, particularly when section 18-3-203(1)(h) is construed together with section 18-3-204(1)(b). As noted above, section 18-3-203(1)(h) requires an intent to "infect, injure, or harm another person." Section 18-3-204(1)(b), in contrast, requires an intent to "harass, annoy, threaten, or alarm."
¶88 The terms "harass," "annoy," "threaten," and "alarm," as those terms are generally used, all refer to emotional states. See, e.g., Harass, Webster's Third New International Dictionary (2002) (defining "harass" to mean, as pertinent here, "to vex, trouble, or annoy continually or chronically"); Annoy, Webster's Third New International Dictionary (defining "annoy" to mean, as pertinent here, "to irritate with a nettling or exasperating effect esp. by being a continuous or repeatedly renewed source of vexation"); Threaten, Webster's Third New International Dictionary (defining "threaten" to mean, as pertinent here, "to utter threats against : promise punishment, reprisal, or other distress to"); Alarm, Webster's Third New International Dictionary (defining "alarm" to mean, as pertinent here, "fear or terror resulting from a sudden sense of danger" and "apprehension of an unfavorable outcome, of failure, or of dangerous consequences").
¶89 In contrast, it appears undisputed that the term "infect" refers to a physical consequence. See Infect, Webster's Third New International Dictionary (defining "infect" to mean, as pertinent here, "to communicate a pathogen or a disease to"). And although "injure" and "harm" can relate to both physical and emotional injuries or harm, I believe that those terms most often connote physical effects. See, e.g., Injure, Webster's Third New International Dictionary (defining "injure" to mean, among other things, "to inflict bodily hurt on"); Harm, Webster's Third New International Dictionary (defining "harm" to mean, among other things, "to cause hurt or damage to : injure").
¶90 To me, distinguishing second and third degree assault in this way (i.e., depending on whether the actor's intent was to cause physical or emotional harm) makes logical sense. Although, to be sure, emotional trauma can be extremely serious and debilitating, in general, an intent to cause physical harm (including an intent to pass on a communicable disease) is viewed as more serious—justifying a more serious penalty—than an intent to cause emotional harm such as harassment, annoyance, a feeling of being threatened, or alarm.
¶91 Moreover, such an interpretation strikes me as the most consistent with the doctrine of ejusdem generis. It is clear to me that the terms "harass," "annoy," "threaten," and "alarm" all fall into the category of emotional ills. In contrast, the terms "infect" and "injure" most often connote physical effects, and when looked at in that light, I would apply the ejusdem generis doctrine to construe "harm," for purposes of the second degree assault statute, likewise to refer to physical harm.
¶92 Such an interpretation also strikes me as consistent with the statutory history of section 18-3-203(1)(h). As discussed above, that provision was the product of a legislative decision to split the intent to "infect, injure, or harm" from the intent to "harass, annoy, threaten, or alarm" and to establish more serious penalties for the former. The most natural dividing line between those separate mental states is the intent to cause physical, as opposed to emotional, harm. And unlike the majority, I perceive nothing in the legislative history to the contrary. Indeed, I perceive nothing at all in the legislative history that informs the meaning of the term "harm" here.
¶93 Finally, and perhaps most significant, defining "harm" to connote physical harm best avoids constitutional problems because it eliminates overlap between section 18-3-203(1)(h) (second degree assault) and section 18-3-204(1)(b) (third degree assault) and provides a clear line to allow prosecutors, jurors, and courts to distinguish between those statutes. ( Section 18-3-203(1)(f.5)(I) contains all of the mental states of section 18-3-204(1)(b), as well as the intent to infect, injure, or harm, and for that reason, it inevitably overlaps with section 18-3-204(1)(b), at least to the extent that both statutes apply to peace officers like the deputies involved here.)
¶94 For these reasons, I would conclude that "harm," for purposes of the second degree assault statute, means physical harm. Because the People have conceded that no evidence exists to support a finding that Plemmons intended to cause either Deputy Blakley or Deputy Paige physical harm, I would conclude that the evidence was insufficient to support Plemmons's convictions under section 18-3-203(1)(h). I would thus reverse the judgments of conviction on those counts, and I would reverse and remand for a new trial, before a properly instructed jury, Plemmons's conviction under section 18-3-203(1)(f.5)(I), which allows for a conviction if she intended either physical or emotional harm.
D. A Call for Legislative Action
¶95 As should be clear from the trial court and division decisions below, the parties' substantial briefing throughout this case, and this court's opinions today, the language of sections 18-3-203(1)(f.5)(I) and 18-3-203(1)(h) is problematic and, reasonable minds might argue, unconstitutional (I express no opinion on that subject here).
¶96 In light of the foregoing, I respectfully encourage the General Assembly to revisit these statutory provisions with an eye toward clarifying what it intended by "intent to ... harm" and articulating more clearly and precisely the proscribed conduct, and in a way that is easily distinguishable from the conduct proscribed by section 18-3-204(1)(b), so as to avoid any questions as to sections 18-3-203(1)(f.5)(I) and 18-3-203(1)(h)'s ongoing constitutionality.
III. Conclusion
¶97 For the above-described reasons, I cannot subscribe to the definition of "harm," as that word is used in sections 18-3-203(1)(f.5)(I) and 18-3-203(1)(h), that the majority adopts today. I would instead adopt a definition that construes harm to mean physical harm because I believe that such a definition is consistent with the statutory text and with the pertinent statutory history, and because I further believe that such a definition best avoids questions as to sections 18-3-203(1)(f.5)(I) and 18-3-203(1)(h)'s constitutionality.
¶98 In light of the foregoing, I would reverse Plemmons's convictions under section 18-3-203(1)(h) (because no evidence supports a finding of her intent to cause physical harm), and I would reverse and remand for a new trial, before a properly instructed jury, Plemmons's conviction under section 18-3-203(1)(f.5)(I) (because that statute allows for conviction if Plemmons intended either physical or emotional harm).
¶99 Accordingly, I respectfully concur in the majority's judgment, only.
1 "Detention facility" in subsection (f.5) includes "any ... vehicle ... where persons are or may be lawfully held in custody or confinement." § 18-3-203 (1)(f.5)(III)(A).
2 For ease of reference, we will refer to "infect, injure, or harm" (as it appears in subsection (h)) and "infect, injure, harm, harass, annoy, threaten, or alarm" (as it appears in subsection (f.5)(I)) as the "intended effects."
3 Section 18-3-204(1)(b) provides that:
A person commits the crime of assault in the third degree if: [t]he person, with intent to harass, annoy, threaten, or alarm another person whom the actor knows or reasonably should know to be a peace officer, a firefighter, an emergency medical care provider, or an emergency medical service provider, causes the other person to come into contact with blood, seminal fluid, urine, feces, saliva, mucus, vomit, or toxic, caustic, or hazardous material by any means, including throwing, tossing, or expelling the fluid or material.
Thus, spitting on one or more of the types of people listed can be a felony or a misdemeanor depending on the actor's specific intent.
4 We granted certiorari to review the following issues:
1. Whether the trial court reversibly erred by instructing the jury on "harm."
2. Whether there was sufficient evidence that petitioner intended to "infect, injure, or harm" under section 18-3-203(1)(h), C.R.S. (2022).
5 According to the explanatory notes in Webster's Third New International Dictionary (2002), the dictionary's use of numbers to separate different definitions, or "senses," of a word "reflects something of the semantic relationship between various senses of a word," but it is only for "lexical convenience" and doesn't "establish an enduring hierarchy of importance among [the senses]." Id. at n.12.4. Rather, "[t]he order of senses is historical: the one known to have been first used in English is entered first." Id. at n.12.5.
6 We have previously cited with approval the following dictionary definitions of "harass": "exhaust, fatigue"; "to annoy persistently"; and "to create an unpleasant or hostile situation for[,] especially by uninvited and unwelcome verbal or physical conduct." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/harass [https://perma.cc/5LTT-TZUE]); see People v. Moreno, 2022 CO 15, ¶ 20, 506 P.3d 849, 854–55.
7 "Annoy" means "to irritate with a nettling or exasperating effect," with "nettling" meaning "to arouse displeasure, impatience, or anger in: provoke, vex." Bolles v. People, 189 Colo. 394, 541 P.2d 80, 82–83 (1975) (quoting Annoy, Webster's New International Dictionary (3d ed. 1961)).
8 "A threat is a statement of purpose or intent to cause injury or harm to the person, property, or rights of another, by the commission of an unlawful act." People v. Hines, 780 P.2d 556, 559 (Colo. 1989).
9 " ‘Alarm’ means ‘to arouse to a sense of danger; to put on the alert; to strike with fear; fill with anxiety as to threaten danger or harm.’ " Bolles, 541 P.2d at 83 (quoting Alarm, Webster's New International Dictionary (3d ed. 1961)).